Kevin Allan BARNES, Appellant,

v.

The STATE of Texas, State.

No. 2–99–322–CR.

Court of Appeals of Texas, Fort Worth.

July 19, 2001.

Law Office of Larry M. Moore, and Larry M. Moore, Fort Worth, for appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Assistant Crim. D.A. and Chief of the Appellate Section, and Edward L. Wilkinson, Anne Box, and Robert Foran, Asst. D.A.s, Fort Worth, for appellee.

PANEL A: CAYCE, C.J.; DAY and DAUPHINOT, JJ.

## OPINION

CAYCE, Chief Justice.

### INTRODUCTION

A jury convicted Kevin Allan Barnes of the offense of capital murder, and the trial court assessed an automatic life sentence. In seventeen points, appellant complains about accomplice witness testimony, the admission of hearsay statements of his co-conspirators, inclusion of the law of parties in the jury charge, the automatic life sentencing scheme, and the affirmative deadly weapon finding in the judgment. We will affirm.

### BACKGROUND

On October 9, 1997, Myron Nash, Carlis Russell, and Tonero Rainey stole "a whole bunch of rifles" and firearms from a house in Arlington, Texas. They loaded the guns into the trunk of Rainey's blue Cadillac and drove to S.R.'s house at 2512 Vogt Street in Fort Worth. S.R. and Nash knew each other because S.R. had previously dated Nash's brother. Nash entered S.R.'s house and told her that he had "just hit a lick" and that he needed to store some things at her house for a short while. S.R. agreed, and Nash and his companions

placed the guns in the attic. S.R. saw some of the guns and described them as old-fashioned. Nash told S.R. that he got them from his uncle's house. One of Nash's companions handed S.R. a derringer and told her she could have it. Before leaving, Nash asked to borrow S.R.'s car, a 1995 red Mitsubishi. S.R. agreed and the men left, leaving Rainey's blue Cadillac in S.R.'s driveway. The three men had been at S.R.'s house for about fifteen or twenty minutes. S.R. did not know Nash's companions, but later identified them in a photographic spread and in a live lineup as Carlis Russell and Tonero Rainey. Nash promised Russell and Rainey that he would "hook all of that up" later.

Later that day, Nash, Russell, and Rainey went to appellant's apartment, arriving in a sports car. Nash and Russell revealed to appellant and D'Andre Edwards that they had stolen the guns from a house in Arlington, and showed them a .38 they had obtained in the robbery. They informed appellant and Edwards that they planned to sell the stolen weapons.

That same evening, the Fort Worth police, conducting an unrelated investigation, obtained permission from S.R. to search her house. The police told S.R. that they were looking for stolen property such as televisions, refrigerators, and appliances. The officers discovered the cache of guns in the attic, but confiscated only the handguns after S.R. claimed that the rifles belonged to her uncle. In addition to the guns, the police officers recovered nineteen rounds of ammunition, a night scope, two bandanas, and a wool cap. S.R. contacted Nash that night and told him that the police had confiscated the firearms. Nash sent someone to pick up the remaining rifles on the evening of October 10, and Nash returned S.R.'s car around 10:30 p.m. that evening.

In a telephone conversation on October 10, appellant discussed "hitting a lick" with Chris Hill. Edwards overheard the conversation because he was listening on the extension in another room of the apartment. Edwards inferred that appellant and Hill were discussing "[m]aking some money" by an "illegal method." About an hour later, appellant and Edwards were joined by Hill, Deangus Wright (known as "D"), and "the white boy." The group was angry with Myron Nash (known as "Big O") for "messing them over with the guns." They again discussed "hitting a lick" and "mak[ing] some money" together. Appellant obtained a gun, and his companions, all but Edwards, made masks out of bandanas. Appellant, Wright, Hill, and the white boy left the apartment after thirty minutes. When they left, appellant had a .38 revolver.

At approximately 2:00 a.m. on October 11, 1997, someone rang the doorbell of S.R.'s house and identified himself as "D." Thinking it was a friend she knew by the name of "Derrick," S.R. unlocked the door. At least three men burst into the room with guns drawn and masks over their faces. One of the assailants held a gun to S.R.'s face and demanded to know where "O" was. The others moved past them into the house. Left alone with S.R., the first intruder sexually assaulted her.

One of the men apparently searched the residence and came back to report that another woman was present in the house, S.R.'s best friend, C.H. He returned to the bedroom where C.H. lay asleep and "started on" her. When the first assailant finished sexually assaulting S.R., he immediately attempted anal intercourse with her while one of his accomplices watched. After the first attacker finished and left the room, the second assailant placed a gun to S.R.'s head and ordered her to perform oral sex on him. Sometime during the

ordeal, one of the attackers "snatched" two bracelets from her wrists. The second assailant forced S.R. at gunpoint to crawl into the back bedroom, where she saw a third man sexually assaulting C.H. Ordered to keep her eyes shut, S.R. only caught glimpses of the assailants.

The assailants then forced S.R. onto the bed and ordered C.H. to perform oral sex on her. C.H. refused, declaring she "wasn't gay." One of the assailants replied that he did not care, and pointed a gun at her. C.H. pretended to perform oral sex on S.R., but the men were not satisfied and forced C.H. to crawl on her hands and knees out of the bedroom.

The first intruder returned and sexually assaulted S.R. again. When he had finished, the attacker stated angrily to S.R.: "[B]itch, you don't have no guns, you don't have no drugs, you don't have nothing in this motherf[---]." S.R. explained that the police had taken the guns, and told him to look at the receipt the officers had left. The man only expressed interest as to why the police had searched the house.

Minutes later S.R. heard a gunshot, heard C.H. scream, and then heard a second gunshot. C.H. was shot in the buttocks and the head. S.R. peered out from under the pillow and saw "someone still standing in the doorway pointing a gun" at her. S.R. was shot several times. She feigned death until the intruders left. The entire house had been ransacked in an obvious effort to find "something or . . . to steal something." C.H. died from the gunshot wounds, but S.R. survived.

Appellant returned to Edwards's apartment with Russell, Hill, Wright, and the white boy around 3:00 a.m. When they returned, Russell had a .38 gun, Hill had a chrome .38, appellant had a .380, and Wright had a .22 derringer. Wright also had a Texas ring and a necklace. Wright, Hill, and Michael Schiavo only stayed for five minutes before they went home. Appellant told Edwards that Wright had "somehow . . . got in the room" and had "sex with one of the girls." Appellant said that Russell "made the girls do things that—that were nasty," including performing oral sex on him and on each other. Appellant admitted to Edwards that Russell had ordered him "to kill the girls" and that appellant shot one of the women "in the butt." Russell then shot the girl in the head. Hill and Russell "shrugged their shoulders" and shot the second victim. Appellant admitted that at least one of the handguns the men had in their possession when they returned had come from S.R.'s house.

From the photographic lineups, S.R. identified Rainey and Russell as the men who had come to her house with Nash to drop off the guns several days before the assault. In addition, she identified Russell as one of the men who had assaulted her. She also picked Russell and Rainey out in live lineups. DNA tests conducted on semen found on the bed sheet in S.R.'s room matched appellant's DNA. DNA from semen taken from a vaginal swab of C.H. was consistent with having come from Hill and Wright.

As a result of the investigation, probable cause warrants were issued for appellant, Deangus Wright, Michael Schiavo, Carlis Russell, and Chris Hill, and they were arrested and charged with capital murder.

## CAPITAL MURDER AND THE LAW OF PARTIES

A person commits capital murder if he intentionally or knowingly commits murder as defined under section 19.02(b)(1) "in the course of committing or attempting to commit . . . robbery [or] aggravated sexual assault." TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994). A person

commits murder under section 19.02(b)(1) if he intentionally or knowingly causes the death of an individual. *Id.* § 19.02(b)(1).

Under the law of parties, a person may be convicted as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. *Id.* § 7.01(a). Section 7.02(a)(2) of the penal code provides that a person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

■ A person is also responsible for the conduct of another if, in an attempt to carry out a conspiracy to commit one felony offense, another felony is committed by one of the conspirators. *Id.* § 7.02(b). Conspiracy liability attaches even though the party did not intend for the act to occur as a result of his conduct when the offense was committed in furtherance of the conspiracy and should have been anticipated as a result of the carrying out of the conspiracy. *Id.; see also Wood v. State,* 4 S.W.3d 85, 89 (Tex.App.—Fort · Worth 1999, pet. ref'd). Notwithstanding the requirement that an actor charged with capital murder must have specifically intended to cause the death of another, the court of criminal appeals has reaffirmed that the "conspirator culpability instruction" in section 7.02(b) is applicable in a capital murder setting. *Fuller v. State,* 827 S.W.2d 919, 932–33 (Tex.Crim.App.1992), *cert. denied,* 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993).

In this case, appellant was charged with the offense of capital murder as a party under section 7.02(a)(2) because he aided or attempted to aid Russell in the offense of murder while in the course of committing robbery or aggravated sexual assault. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), 19.03(a)(2). Appellant was further charged as a party under section 7.02(b) because he was a co-conspirator in an agreement to commit robbery or aggravated sexual assault and Russell murdered the victim in furtherance of that agreement.[1] *See id.* §§ 7.02(b), 19.03(a)(2).

## ACCOMPLICE WITNESS TESTIMONY

In his first and second points, appellant complains that the trial court erred in failing to instruct the jury that D'Andre Edwards was an accomplice as a matter of law or in failing to submit the issue to the jury as a matter of fact because Edwards was susceptible to prosecution as a party or as a co-conspirator.

■ The accomplice witness rule mandates that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed." TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979). An accomplice witness is one who participates with a defendant before, during, or after commission of the offense, including actions that show an understanding and common design to do a certain act. *McFarland v. State,* 928 S.W.2d 482, 514 (Tex.Crim.App. 1996), *cert. denied,* 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997); *Kunkle v. State,* 771 S.W.2d 435, 439 (Tex.Crim.App. 1986), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989). The partic-

---

1. The charge also contained lesser included offenses of aggravated sexual assault, aggravated robbery, and aggravated assault. Because the jury found appellant guilty of capital murder, they did not reach the lesser included offenses.

ipation must be some affirmative act committed by the witness to assist or promote the commission of the offense. *Kutzner v. State,* 994 S.W.2d 180, 187 (Tex.Crim.App. 1999); *McFarland,* 928 S.W.2d at 514.

A witness is not deemed an accomplice because he knew of the crime but failed to disclose it, or even concealed it. *Medina v. State,* 7 S.W.3d 633, 641 (Tex. Crim.App.1999), *cert. denied,* 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000); *Harris v. State,* 738 S.W.2d 207, 216 (Tex.Crim.App.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). The defendant is entitled to an accomplice witness instruction only if there is sufficient evidence in the record of the witness's participation in the crime to support a charge against the witness for the offense with which the accused is charged or a lesser included offense. *Medina,* 7 S.W.3d at 641; *Blake v. State,* 971 S.W.2d 451, 454–55 (Tex.Crim.App.1998).

In this case, Edwards testified that he overheard appellant and Hill talking on the phone about "hitting a lick." Edwards only listened to the discussion. Later that night, appellant and several of his accomplices met at the apartment where Edwards was staying. Appellant, Hill, Wright, and "the white boy" talked about finding "Big O" because they were angry at him for "messing them over with the guns" and they discussed "hitting a lick." The group never said where they were going or what they were going to do. Edwards testified that he listened to the conversation but did not participate in it. Edwards saw appellant and his companions obtain a .38 revolver and "do-rags" that they used as masks. Edwards asked if he could go with them. He was told that there was not enough room in the car for him, so he stayed behind. When the group returned several hours later, appellant described to Edwards how they had gone to an apartment where they sexually assaulted and then "killed some girls."

Based on these facts, we conclude that Edwards was not an accomplice as a matter of law or as a matter of fact because he took no affirmative act to assist or promote the commission of the offense of capital murder. He did not help appellant or his accomplices plan the offense; he did not help them obtain the weapons or disguises used in the offense; he was not present during the commission of the offense; and he did not participate in the commission of the offense. Even though Edwards expressed a willingness to participate by asking if he could join them, he did not go with them nor did he know where they were going or what they were planning to do. At most, the evidence shows that Edwards knew about the crime after it had been committed and that he concealed his knowledge by not reporting it to law enforcement officials. Under these facts, Edwards could not have been prosecuted for capital murder or one of the lesser included offenses as a principal or a party. Thus, the trial court properly refused appellant's requested accomplice witness instructions. We overrule points one and two.

## HEARSAY TESTIMONY

In points three and four, appellant contends that the trial court erred in admitting the hearsay statements of Tonero Rainey, Michael Schiavo, and Deangus Wright.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex.Crim. App.2000); *Moon v. State,* 44 S.W.3d 589, 593 (Tex.App.—Fort Worth 2001, pet. ref'd). The trial court's ruling will be upheld as long as it is within the "zone of

reasonable disagreement." *Weatherred,* 15 S.W.3d at 542.

■ If the trial court erroneously admits hearsay, we conduct a harm analysis. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998); *see also* TEX.R.APP. P. 44.2(b). Under this analysis, we are to disregard the error unless it affected appellant's substantial rights. TEX.R.APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Coggeshall v. State,* 961 S.W.2d 639, 643 (Tex. App.—Fort Worth 1998, pet. ref'd) (en banc). In making this determination, we review the record as a whole. *See Johnson,* 967 S.W.2d at 417; *King,* 953 S.W.2d at 271.

■ In point three, appellant complains that the trial court erred in allowing the hearsay statement of Tonero Rainey. Detective John David Thornton testified that Rainey "denied being at the Arlington offense, but stated that he wanted to help with everything, but he felt that his life would be in danger if he did." Appellant objected at trial and asserts on appeal that this statement was inadmissible hearsay because it was not made in conjunction with a statement against the declarant's penal interest. *See* TEX.R. EVID. 803(24). In response, the State urges that Rainey's statement qualifies as an exception to the hearsay rule because it was a statement of Rainey's then existing mental, emotional, or physical condition under Rule 803(3).

■ Rule 803(3) provides the following exception to the hearsay rule:

A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

TEX.R. EVID. 803(3). A statement that the declarant is afraid or testimony demonstrating that the declarant was afraid when he made the statement qualifies under Rule 803(3). *See, e.g., Martinez v. State,* 17 S.W.3d 677, 688 (Tex.Crim.App. 2000) (allowing declarant's statement that she was afraid of man with same first name as appellant); *Williams v. State,* 798 S.W.2d 368, 371 (Tex.App.—Beaumont 1990, no pet.) (admitting testimony describing declarant's disturbed emotional state because it demonstrated her fear of defendant when she said defendant was going to kill her and her children). In contrast, a statement from which the declarant's fear can only be reached by inference is an inadmissible statement of belief. *See, e.g., Dorsey v. State,* 24 S.W.3d 921, 928 (Tex.App.—Beaumont 2000, no pet.) (holding that declarant's statement that if anything strange happened to her, like car crash, it meant that defendant had killed her, is one of belief); *Barnum v. State,* 7 S.W.3d 782, 790–91 (Tex.App.—Amarillo 1999, pet. ref'd) (excluding statement that declarant believed husband was contemplating her murder for life insurance proceeds because declarant's belief and mental state is evidenced only by inference); *Navarro v. State,* 863 S.W.2d 191, 197 (Tex.App.—Austin 1993) (concluding decedent's statement that defendant put gun to her head and threatened to kill her was one of memory because it reflected her fear of appellant by inference), *pet. ref'd,* 891 S.W.2d 648 (Tex.Crim.App.1994).

Rainey's statement to Detective Thornton is one of belief offered to prove the

truth of the matter asserted: that if he helped the detective's investigation, his life would be in danger. Rainey's mental state is evidenced only by inference. The admission of the statement, however, is harmless error. The statement did not make appellant appear any more or less guilty than he would have had the statement been excluded. Instead, the statement merely shows declarant's belief that there was some threat against his life that prevented him from cooperating with the detective's investigation. This statement is not relevant to prove any fact or element of the State's case against appellant and did not substantially affect appellant's rights. *See* Tex.R.App. P. 44.2(b). We overrule point three.

In point four, appellant argues that the trial court erred by admitting the statements of appellant's co-conspirators under Rule 803(24). Appellant urges that Schiavo's and Wright's statements to Detective Thornton were not statements against their interest because the record is silent as to what culpability they assigned to themselves. We agree.

■ Rule 803(24) provides:

A statement which was at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Tex.R. Evid. 803(24). Although Rule 803(24) provides for an exception to the hearsay rule for a statement against the declarant's interest, it "does not provide a hearsay rule exception for a declarant's statement which is against *someone else's* interest, e.g. a third-party, a co-actor, or a co-defendant." *Cofield v. State*, 891 S.W.2d 952, 955 (Tex.Crim.App.1994). Accordingly, a statement against the third party's interest must also be sufficiently against the declarant's interest to be reliable. *Guidry v. State*, 9 S.W.3d 133, 149 (Tex.Crim.App.1999), *cert. denied*, 531 U.S. 837, 121 S.Ct. 98, 148 L.Ed.2d 57 (2000).

■ During his investigation, Detective Thornton interviewed Schiavo and Wright about their participation in the capital murder. Detective Thornton offered the following description of those interviews:

Q. [BY PROSECUTOR] Did you ever interview an individual named Michael Schiavo?

A. Yes, I did.

Q. Did he give you a statement about his participation in this capital murder?

A. Yes, he did.

Q. And did you also interview another individual named Deangus Wright?

A. Yes, I did.

Q. Did he give you a statement about his participation in this capital murder?

A. Yes.

[APPELLANT]: Judge, I'm going to object to that. That assumes that the statement that he gave pertaining to an offense that he says that he committed and that is hearsay as to any statement that he gave and what it contained for him to say what the substance was.

THE COURT: Overruled.

Q. [BY PROSECUTOR] Both of these men that gave you these statements, did they tell you who else was involved in the capital murder?

A. Yes, he did. Yes, they did.

Q. And who did they say committed this capital murder on October 11th, 1997?

[APPELLANT]: Your Honor, we're going to object for the reason it will be hearsay.

THE COURT: Overruled.

THE WITNESS: Kevin Barnes.

Although Detective Thornton testified that Wright and Schiavo gave statements about their participation in the capital murder, the detective did not specify what they claimed their roles, if any, were in the capital murder. He only testified that Schiavo and Wright told him that appellant committed the capital murder on October 11, 1997. The statements made by Schiavo and Wright in this case are not so equally against their own interest as to reach the level or reliability required by Rule 803(24). *See Guidry*, 9 S.W.3d at 149. The trial court, therefore, abused its discretion in admitting the detective's testimony.

We must next review the record as a whole to determine whether the admission of those statements affected appellant's substantial rights. *See* TEX.R.APP. P. 44.2(b). Appellant confessed to D'Andre Edwards shortly after returning from the commission of the offense on October 11. Appellant told Edwards that Russell had ordered him to kill the girls and that appellant shot one of the girls "in the butt." Appellant also said that he watched Russell and Hill shoot the other girl and he watched Wright and Russell sexually assault the girls. In addition to his statements, appellant's DNA was recovered in semen found at the scene of the offense. The surviving victim testified that at least three men were involved in the sexual assaults and shootings of both victims, and

her description of the events closely matches the description appellant gave to Edwards shortly after the crime occurred. We conclude that, in the context of the entire case against appellant, the trial court's error in admitting the hearsay statements of Schiavo and Wright did not have a substantial or injurious effect on the jury's verdict. *See King*, 953 S.W.2d at 271. We, thus, disregard the error and overrule point four. *See* TEX.R.APP. P. 44.2(b).

## OBJECTIONS TO THE CHARGE

In points five through fifteen, appellant argues that the trial court erred in overruling his objections to the jury charge and denying his requested instructions.[2] Appellant argues that the trial court erred by: (A) failing to limit the definition of "intentionally"; (B) failing to require the jury to find that appellant was a party to the offense of capital murder; (C) failing to require the jury to find that both appellant and Russell had the specific intent to kill; (D) failing to instruct the jury on the affirmative defense of independent impulse; (E) allowing the jury to find appellant guilty without requiring that Russell be a co-conspirator; and (F) submitting an instruction under penal code section 7.02(b) for co-conspirator liability when it was not raised by the evidence.

### A. Definition of "Intentionally"

First, appellant complains that the trial court erred by defining "intentionally" because the trial court failed to limit its application to the result of the conduct. In other words, he contends that the charge should have instructed the jury that appellant specifically intended that death result from his conduct and not that appellant

2. Although appellant's brief joins all eleven points into a single argument, we have divid-

ed his complaints into six categories for ease of discussion.

intended to engage in the conduct that caused the victim's death.

■ Appellant requested the following definition of "intentionally": "A person acts intentionally or with intent with respect to the nature of his conduct when it is his conscious objective or desire to cause the result." The trial court denied appellant's request and charged the jury as follows: "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."

■ There are three "conduct elements" that can be involved in an offense: (1) the nature of the conduct; (2) the result of the conduct; and (3) the circumstances surrounding the conduct. *McQueen v. State*, 781 S.W.2d 600, 603 (Tex.Crim.App.1989); *see also* TEX. PENAL CODE ANN. § 6.03(a), (b) (defining "intentionally" and "knowingly"). The "conduct element" of an offense is the element to which the culpable mental state must apply. *Cook v. State*, 884 S.W.2d 485, 487 (Tex.Crim.App.1994). An offense "may contain any one or more of these 'conduct elements' which alone or in combination form the overall behavior which the Legislature has intended to criminalize." *McQueen*, 781 S.W.2d at 603. A trial court must tailor its charge in relation to the conduct element of any given offense. *See Cook*, 884 S.W.2d at 487. Therefore, where the charged offense does not include a particular conduct element, the court's charge should not contain a definition of the culpable mental state for that conduct element in the abstract or application portions of the charge. *See Patrick v. State*, 906 S.W.2d 481, 492 (Tex.Crim.App.1995), *cert. denied*, 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996).

■ Capital murder is a "result of conduct" offense that, depending upon the underlying conduct which elevates the intentional murder to capital murder, may also include the elements for the nature of the conduct or the circumstances surrounding the conduct. *Id.* at 491; *Hughes v. State*, 897 S.W.2d 285, 295 (Tex.Crim.App.1994), *cert. denied*, 514 U.S. 1112, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995). The underlying offense of robbery consists of all three conduct elements: (1) caused bodily injury (result of conduct); (2) the robbery is committed in the course of committing theft (circumstances surrounding conduct); and (3) the unlawful appropriation of property (nature of conduct). *Ash v. State*, 930 S.W.2d 192, 195 (Tex.App.—Dallas 1996, no pet.). The underlying offense of aggravated sexual assault is comprised either of the nature of conduct or the result of conduct element, and the trial court may include both in its instruction. *Murray v. State*, 804 S.W.2d 279, 281 (Tex.App.—Fort Worth 1991, pet. ref'd). Because all three conduct elements are implicated by the underlying offenses in this case, the trial court properly instructed the jury on the statutory definition of "intentionally," which includes the result of conduct and the nature of conduct elements. *See* TEX. PENAL CODE ANN. § 6.03(a).

## B. Party to the Offense of Capital Murder

Appellant argues that the trial court erred in charging him under section 7.02(a)(2) of the penal code. Appellant contends that the first paragraph allowed the jury to find him guilty of capital murder even if the jury believed that Russell was not a party to the aggravated sexual assault, and without requiring Russell to be guilty of capital murder.

■ The first application paragraph stated the following:

> Now if you find from the evidence beyond a reasonable doubt that on or about the 11th day of October, 1997, in Tarrant County, Texas, Carlis Russell did intentionally cause the death of an individual, [C.H.], by shooting her with a deadly weapon, to-wit: a firearm, and the said [appellant] was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault of [C.H.], and [appellant], acting with the intent to promote or assist the commission of the murder, if any, solicited, encouraged, directed, aided or attempted to aid Carlis Russell in the commission of the murder [then you will find appellant guilty of the offense of capital murder].

This paragraph instructed the jury to determine whether appellant was criminally responsible as a party to C.H.'s murder in the course of committing or attempting to commit aggravated sexual assault as a principal. Appellant's guilt as a principal to aggravated sexual assault, coupled with his guilt as a party to murder in the course of committing the aggravated sexual assault, elevated the offense to capital murder, regardless of whether Russell was a party to the aggravated sexual assault or guilty of capital murder. *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2), 19.03(a)(2).

Section 7.01(a) specifically provides for such an occurrence because it states that a person is criminally responsible as a party to an offense if the offense "is committed by his own conduct, by the conduct of another for which he is criminally responsible, *or by both.*" *Id.* § 7.01(a) (emphasis supplied). Thus, under the law of parties, appellant would be guilty as a party if both the murder and the underlying felony offense were committed by appellant as a principal; if both the murder and the felony were committed by another for which appellant was criminally responsible; or, if the murder were committed by another for whom appellant was criminally responsible and the underlying felony offense were committed by appellant as a principal. *See id.* The first application paragraph is, therefore, proper.

■ Appellant also complains that the third application paragraph erroneously instructed the jury to determine whether appellant aided or attempted to aid Russell in the commission of the offense of murder, instead of the commission of the offense of *capital* murder. The third application paragraph instructed the jury as follows:

> If you find from the evidence beyond a reasonable doubt that on or about the 11th day of October, 1997, in Tarrant County, Texas, Carlis Russell, did intentionally cause the death of an individual, [C.H.], by shooting her with a deadly weapon, to-wit: a firearm, and the said Carlis Russell was then and there in the course of committing or attempting to commit the offense of robbery of [C.H.], and [appellant], acting with the intent to promote or assist *the commission of the offense of capital murder,* if any, solicited, encouraged, directed, aided or attempted to aid Carlis Russell *in the commission of the offense* [then you will find appellant guilty of the offense of capital murder]. [Emphases supplied.]

The prepositional phrase "in the commission of the offense" refers to the previous phrase "the offense of capital murder." Read as a whole, the instruction requires the jury to determine whether appellant "solicited, encouraged, directed, aided or attempted to aid" Russell in the commission of the offense of capital murder. The third application paragraph correctly applies the law of parties to the State's theory of capital murder.

## C. Specific Intent to Kill

Appellant further alleges that the trial court erred in submitting application paragraphs one and three because they allowed the jury to convict appellant of capital murder without finding that each of the actors specifically intended the death to occur, as required by sections 19.03(a)(2) and 7.02(a)(2) of the penal code.

In a prosecution for capital murder under section 19.03(a)(2), in order to convict the accused as a primary actor the State must prove and the jury must find that he "intentionally commit[ted] the murder" in the course of the underlying felony. *Tucker v. State*, 771 S.W.2d 523, 530 (Tex.Crim.App.1988), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989). Moreover, before the accused may be found criminally responsible for the conduct of another who "intentionally commit[s] the murder," under the provisions of section 7.02(a)(2), it must be shown the accused harbored a specific "intent to promote or assist the commission of" the intentional murder that the other committed. *Lawton v. State*, 913 S.W.2d 542, 554 (Tex. Crim.App.1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996). The court of criminal appeals has held that "[o]ne could hardly indulge an intent to promote or assist in the commission of an intentional murder without, at a minimum, intending or contemplating that lethal force would be used." *Tucker*, 771 S.W.2d at 530.

Contrary to appellant's argument, the charge required the jury to find that both Russell and appellant had the specific intent to kill. As to Russell's intent, paragraphs one and three required the jury to find that Russell "did intentionally cause the death of [the victim] by shooting her with a deadly weapon." As to appellant's intent, paragraph one only allowed a conviction if the jury found that appellant "acting with the intent to promote or assist the commission of the murder, if any, solicited, encouraged, directed, aided or attempted to aid Carlis Russell in the commission of the murder." Similarly, paragraph three commanded the jury to find appellant guilty of capital murder if it determined beyond a reasonable doubt that appellant was "acting with the intent to promote or assist the commission of the offense of capital murder," and aided or attempted to aid Russell in the commission of the capital murder. These instructions necessarily required the jury to ascertain that appellant and Russell specifically intended the death of the victim. *See id.*

## D. Independent Impulse

Appellant complains that the trial court erred in denying his requested instruction on independent impulse. A charge on independent impulse is an affirmative defensive instruction allowing the jury to acquit the defendant if it finds, or has a reasonable doubt, that the defendant did not and reasonably could not have anticipated the commission of the actual offense. *Fincher v. State*, 980 S.W.2d 886, 888 (Tex.App.—Fort Worth 1998, pet. ref'd).

In order to authorize an instruction on independent impulse there must be evidence that an accused, though he admittedly intended to participate in some wrongful conduct, did not contemplate the extent of criminal conduct committed by his companions, and thus he should not be held vicariously responsible for their conduct. *Mayfield v. State*, 716 S.W.2d 509, 513 (Tex.Crim.App.1986); *Fincher*, 980 S.W.2d at 888. An independent impulse instruction is not required, however, when the charge actually given to the jury tracks the language of section 7.02 of the penal code and requires the jury to

find that the aggravating felony was one that should have been anticipated as a result of carrying out the conspiracy, because such an instruction presents the issue of independent impulse to the jury. *Davis v. State,* 651 S.W.2d 787, 792 (Tex. Crim.App.1983); *Fincher,* 980 S.W.2d at 888.

Although the trial court did not submit the independent impulse theory to the jury, the instruction required jurors to find the murder of C.H. "was committed in furtherance of the unlawful purpose to commit robbery [or aggravated sexual assault] and was an offense that should have been anticipated as a result of the carrying out of the agreement." The submitted charge required the jury to acquit appellant if the offense of murder was beyond his contemplation. This adequately set out the defensive theory of independent impulse. *See Davis,* 651 S.W.2d at 792; *Fincher,* 980 S.W.2d at 888.

■ Moreover, the evidence in the record does not support the submission of an independent impulse instruction. The evidence shows that appellant and his co-conspirators discussed "hitting a lick" shortly before the capital murder, and appellant carried a gun with him when the group left the house. Once they arrived at S.R.'s house, Russell told appellant to "kill the girls," and appellant shot one girl "in the butt." Appellant's semen was also found at the scene of the capital murder. Based on this record, there is no evidence that appellant did not contemplate the extent of his companions' criminal conduct in carrying out the agreement to commit robbery or aggravated sexual assault. The trial court did not err by refusing to send the additional instruction to the jury.

### E. Russell as Co–Conspirator

Appellant complains that the trial court's charge to the jury under section 7.02(b) failed to require that Russell be a party to the underlying offense of aggravated sexual assault and, thus, reduced the State's burden of proof. He specifically urges that using "and/or" to connect the potential co-conspirators in paragraphs two and four of the charge made it possible for the jury to find appellant guilty of capital murder without Russell being a party to the offense.

■ Paragraph two instructed the jury as follows:

If you believe from the evidence beyond a reasonable doubt that [appellant] entered into a conspiracy with *Carlis Russell and/or Christopher Hill, and/or Deangus Wright and/or Michael Schiavo* to commit the felony offense of aggravated sexual assault and that on the 11th day of October, 1997, in the County of Tarrant, and State of Texas, in the attempt to carry out this agreement, if any, Carlis Russell did then and there intentionally cause the death of an individual, [C.H.], by shooting her with a deadly weapon, to-wit: a firearm, if he did, and that such offense was committed in furtherance of the unlawful purpose to commit aggravated sexual assault and was an offense that should have been anticipated as a result of the carrying out of the agreement though [appellant] may have had no intent to commit it [then you will find appellant guilty of the offense of capital murder]. [Emphasis supplied.]

Paragraph four was identical to paragraph two, except that it charged the "felony offense of robbery" instead of the "felony offense of aggravated sexual assault."

The first part of both paragraphs connects the names of the co-conspirators with "and/or," thus making it hypothetically possible that Russell was not one of the co-conspirators. Nonetheless, in order to

find appellant guilty of capital murder, the paragraphs later require the jury to find that Russell intentionally caused the death of C.H. by shooting her with a firearm in furtherance of the agreement to commit the underlying felony offenses. Even though the first part of the paragraphs is arguably ambiguous as to whether Russell had to be a co-conspirator, the second part absolutely requires Russell's involvement in the conspiracy. The charge merely alerts the jury that it was not necessary to · find that Hill, Wright, or Schiavo were co-conspirators to conclude that appellant was guilty as a party. The trial court properly submitted the charge in paragraphs two and four.

### F. Agreement to Commit the Underlying Felony Offenses

Appellant asserts that the trial court erred in submitting paragraphs two and four because there is no evidence to support an agreement to commit a robbery or aggravated sexual assault.

■ An instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties. *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim.App.1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). In determining whether a defendant participated as a party in the commission of an offense, the fact finder may look to events that occurred before, during, or after the offense, and may place reliance on acts showing an understanding and common design. *Ransom v. State*, 920 S.W.2d 288, 302 (Tex.Crim.App.) (op. on reh'g), *cert. denied*, 519 U.S. 1030, 117 S.Ct. 587, 136 L.Ed.2d 516 (1996).

■ An agreement of the parties to act together in a common design seldom can be proven by direct evidence; reliance therefore may be placed upon the actions of the parties, showing either by direct or circumstantial evidence an understanding and common design to do a certain act. *Burdine v. State*, 719 S.W.2d 309, 315 (Tex.Crim.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Rivera v. State*, 990 S.W.2d 882, 887 (Tex. App.—Austin 1999, pet. ref'd), *cert. denied*, 528 U.S. 1168, 120 S.Ct. 1191, 145 L.Ed.2d 1096 (2000). Evidence is legally sufficient to convict under the law of parties when the defendant is physically present at the commission of the offense and encourages its commission by acts, words, or other agreement. *Ransom*, 920 S.W.2d at 302. Moreover, the jury may infer the intent to kill from the use of a deadly weapon. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim.App.1996), *cert. denied*, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997).

■ Contrary to appellant's argument, there was ample evidence to support the submission of appellant's criminal responsibility as a party under section 7.02(b) of the penal code. The actions of appellant and his accomplices demonstrate an understanding and common design to commit the offense of robbery. Their discussions about "hitting a lick" and "making some money," coupled with their preparation in securing weapons and masks, show a readiness to commit robbery. Their bursting into S.R.'s house with drawn guns and masks, and their immediate search of the residence while one of the members of the gang interrogated the first victim, demonstrates not just an agreement, but a certain level of coordination regarding their respective roles in the robbery. One of the assailant's complaints to S.R. about the lack of guns or drugs further suggests the conspirators' agreed aim of committing robbery. In addition, the theft of the .38 revolver and the bracelets, and the "ran-

sacking" of the house, further support the conclusion that appellant and his accomplices had agreed to rob the victims.

Likewise, an agreement to commit sexual assault is also established by the evidence. The first assailant's sexual assault of S.R., after interrogating her but before the co-conspirators' search of the apartment was completed, suggests that the conspirators had planned to sexually assault the girls. Similarly, the assailants' repeated sexual assaults of S.R. and C.H. at gunpoint shows that at least once they had arrived at S.R.'s house, the members of the conspiracy agreed to sexually assault the girls. In addition, the fact that the conspirators forced S.R. and C.H. to crawl in the nude from one room to another on their hands and knees shows that the members of the gang agreed to sexually assault the victims. Because there was sufficient evidence to support a jury verdict that appellant is criminally responsible under the law of parties, the trial court did not err in submitting paragraphs two and four to the jury. *See Ladd,* 3 S.W.3d at 564.

Having determined that the trial court did not err in submitting the charge instructions to the jury, we overrule points five through fifteen.

## CONSTITUTIONALITY OF AUTOMATIC LIFE SENTENCE

In his sixteenth point, appellant urges that article 37.071, section 1 of the code of criminal procedure and section 12.31 of the penal code are unconstitutional because they mandate that appellant is given an "automatic life" sentence without a hearing on punishment. Appellant states that this automatic sentencing scheme violates the Eighth Amendment of the United States Constitution. He also requests a propor-

tionality review between his offense, Russell's offense, and the resulting sentences.

■ Appellant was under the age of seventeen at the time he committed the capital offense. Under section 8.07(c) of the penal code, the death penalty is not available for a juvenile offender who is younger than seventeen years of age. TEX. PENAL CODE ANN. § 8.07(c) (Vernon Supp.2001). The law statutorily considers youth in mitigation of the death penalty and thereby mandates the lesser of the two possible punishments for capital murder. *Prater v. State,* 903 S.W.2d 57, 60 (Tex.App.—Fort Worth 1995, no pet.). When a person is convicted of capital murder and the death penalty is not available, there is only one possible punishment—life imprisonment with the possibility of parole after forty years. TEX.CODE CRIM. PROC. ANN. art. 37.071, § 1 (Vernon Supp.2001); TEX. PENAL CODE ANN. § 12.31 (Vernon 1994); TEX. GOV'T CODE ANN. § 508.145(b) (Vernon Supp.2001).

It is well settled that a mandatory life sentence for the offense of capital murder is not unconstitutional. *Harmelin v. Michigan,* 501 U.S. 957, 994–95, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991); *Prater,* 903 S.W.2d at 60; *see also Pondexter v. State,* 942 S.W.2d 577, 587 (Tex.Crim. App.1996), *cert. denied,* 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997). We, therefore, overrule appellant's sixteenth point.

## DEADLY WEAPON FINDING

In his seventeenth point, appellant complains that the trial court erred in including an affirmative deadly weapon finding in the judgment. He specifically asserts that because the jury trial only addressed his guilt as a party, there was no jury issue submitted as to whether appellant used or exhibited a deadly weapon.

■■■ A trial court may enter an affirmative finding on the use of a deadly weapon when the jury affirmatively answers a special issue on the use of a deadly weapon. *Davis v. State*, 897 S.W.2d 791, 793 (Tex.Crim.App.1995). However, when the jury is instructed on the law of parties, the jury must expressly state that appellant either used or exhibited a deadly weapon or knew that one would be used or exhibited during the commission of the offense. *Taylor v. State*, 7 S.W.3d 732, 740–41 (Tex.App.—Houston [14th Dist.] 1999, no pet.). Generally, when the jury assesses punishment and has been instructed on the law of parties, the court may not itself enter a finding that a deadly weapon was used. *Id.* at 741.

■■■ The jury in this case was not given a special issue on the use of a deadly weapon. Because appellant was charged as a party, we have no way of knowing from this record if the jury would have found that appellant knew that a deadly weapon would be used or exhibited or that he used one himself. The reviewing court has the authority to reform the judgment to delete the affirmative finding entered by the trial court if warranted. *Bruton v. State*, 921 S.W.2d 531, 538 (Tex.App.—Fort Worth 1996, pet. ref'd). However, such a reformation is unnecessary here because we conclude that the erroneous entry of a deadly weapon finding was harmless in this case. *See Upson v. State*, 949 S.W.2d 531, 533 (Tex.App.—Houston [14th Dist.] 1997, no pet.).

An error is harmless when an appellate court determines beyond a reasonable doubt that it has made no contribution to the conviction or punishment. *See* Tex. R.App. P. 44.2(b). When an affirmative deadly weapon finding has been entered, the defendant is not eligible for parole until his actual calendar time served, without consideration of good conduct time, equals one-half of the maximum sentence or thirty calendar years, whichever is less, so long as it is not less than two calendar years. Tex. Gov't Code Ann. § 508.145(d). In contrast, a capital murder sentence requires the convicted felon to serve a minimum of forty years before becoming eligible for parole. *Id.* § 508.145(b). Because appellant was convicted of the offense of capital murder, he must serve a minimum of forty years regardless of the deadly weapon finding. We, therefore, hold that the error occurring in this case was harmless and overrule appellant's seventeenth point.

## CONCLUSION

Having overruled each of appellant's points, we affirm the trial court's judgment.

DAUPHINOT, J. filed a concurring opinion.

DAUPHINOT, Justice, concurring.

While I concur in the result the majority reaches, I write separately to address the problem of treating section 7.02(b) of the Texas Penal Code as an alternative law of parties. Section 7.02 is entitled "Criminal Responsibility for Conduct of Another."[1] Although it is often referred to as "The Law of Parties," this description is inaccurate. Section 7.02 describes the circumstances under which a person is criminally responsible for the conduct of another. It includes the law of parties in section 7.02(a), but it also includes the law of conspiracy in section 7.02(b). A person is criminally responsible for the conduct of another if he or she acts either as a party or as a co-conspirator. The law of conspiracy is not the law of parties.

1. Tex. Penal Code Ann. § 7.02 (Vernon 1994).

Two conflicting lines of cases have developed regarding the relation between the law of parties and the law of conspiracy. I believe the majority opinion conflicts with this court's opinion in *Ex parte Brosky*.[2] In *Brosky*, this court held that Brosky could be prosecuted for conspiracy to commit murder after being convicted of murder as a party because conspiracy required an additional element not required by murder.[3] We specifically stated that while criminal conspiracy requires proof of an agreement to commit an offense, murder as a party does not require proof of an agreement.[4]

In the case now before us, two of the application paragraphs of the jury charge required the jury to find a conspiracy, that is, an agreement. Yet, Appellant was not accused of entering into a conspiracy. In *Brosky*, we held that the additional element of an agreement establishes an offense separate and apart from guilt as a party.[5] The State's position is that section 7.02(b) is distinct from the section 15.02 conspiracy statute because section 15.02 requires only proof that the defendant agreed with one or more persons to engage in conduct that would constitute an offense and that the defendant or another co-conspirator performed an overt act in pursuance of that agreement.[6] In contrast, section 7.02(b) requires proof that, in an attempt to carry out a conspiracy to commit one felony, another felony, which should have been anticipated, is committed in furtherance of the intended felony.[7] Thus, the State believes, the corpus delicti of conspiracy under section 15.02(a) is an agreement and an overt act in furtherance of that agreement, and commission of a substantive offense is not required. On the other hand, the State posits, section 7.02(b) requires proof of the commission of a substantive offense. I cannot disagree with this premise. I do, however, disagree with the logical conclusion.

When a person is shown to be guilty of conspiracy under section 15.02, the person is criminally responsible for his or her own acts. That is, the person is guilty of participating in a criminal conspiracy. Similarly, when a person is shown to have committed capital murder, that person is criminally responsible for his or her own acts. When, however, a person is proved guilty of capital murder as a party, that person is held criminally responsible for the acts of another. Likewise, when a person enters into a criminal conspiracy but a different felony is committed by a co-conspirator, he or she is held criminally responsible for the acts of the co-conspirator. The fact that there are procedural differences between prosecuting one as a party and prosecuting one as a co-conspirator, to me, emphasizes the distinction between section 7.02(a) and section 7.02(b).

To continue reliance on the line of cases holding that section 7.02(b) conspiracy is merely an "alternative 'parties' charge," [8] not only fosters conflicting lines of cases, but it also undermines the viability of Texas's capital murder scheme by permitting conviction of capital murder under the guise of the law of parties, without proof of the mens rea required by statute. Under the *Montoya* line of cases, the jury must

2. 863 S.W.2d 783 (Tex.App.—Fort Worth 1993, no pet.).

3. *Id.* at 788.

4. *Id.* at 784, 788.

5. *Id.* at 788.

6. Tex. Penal Code Ann. § 15.02(a) (Vernon 1994).

7. *Id.* § 7.02(b).

8. *Montoya v. State,* 810 S.W.2d 160, 165 (Tex. Crim.App.1989), *cert. denied,* 502 U.S. 961, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991).

find that the primary actor, the shooter, intended to cause the victim's death in order to satisfy the requisites of capital murder permitting the death penalty. But in order to convict the non-shooter as a party and to impose the death penalty, the jury is not required to find that the non-shooter intended to cause the death or that the shooter intended to cause the death, even though both section 19.03(a)(2) and the indictment require proof of specific intent to cause the death.[9] This interpretation allows conviction on less evidence than required by either the statute or the indictment. The jury charge should contain all of the fundamental elements of the offense and should not allow conviction on less proof than required by the statute.

I respectfully urge the court of criminal appeals to revisit this issue, not only in the interest of consistency, but also in the interest of preserving the viability of the Texas capital murder scheme. In any event, this court should either follow *Brosky* or disavow that opinion.

---

9. TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994).