COURT OF
APPEALS

                                                    EIGHTH DISTRICT
OF TEXAS

                                                               EL
PASO, TEXAS

 

                                                                              )     

SIDNEY
ROBOTUS DIGBIE,                             )                    No. 
08-01-00066-CR

                                                                              )

Appellant,                          )                             Appeal from

                                                                              )     

v.                                                                           )                      243rd District Court

                                                                              )

THE STATE OF TEXAS,                                     )                 of El Paso County, Texas

                                                                              )

Appellee.                           )                         (TC# 980D11753)

 

O
P I N I O N

 

Sidney
Robotus Digbie appeals his
robbery conviction.  A jury found
Appellant guilty and assessed his punishment at a fine of $10,000 and
imprisonment for a term of sixteen years. 
We affirm.

FACTUAL SUMMARY








Jose
Dominguez and Jose Rafael Pena met at El Paso Community College.  In late 1998, they began working together on
an illegal drug transaction involving the purchase of 500 pounds of marihuana
on behalf of individuals from out of state. 
One of those men was Herman Lawson. 
Dominguez contacted a person he knew as Chris Sainsbury[1]
to provide the marihuana and they negotiated a price of $20,000 per 100
pounds.  On December 11, 1998, the
buyers, including Lawson, arrived in El Paso with over $100,000.  One of Lawson=s
friends, Derek Kennedy, flew into El Paso and rented a car for the purpose of
transporting the marihuana back to the East Coast.        On
the evening of December 11 at about 7 p.m., Dominguez and Pena met with two
individuals, Joey Martinez and Chris Szczech, who
were associated with Sainsbury.  They met
at a Taco Bell for the purpose of showing the sellers the money.  After Pena showed them $20,000, Martinez and Szczech made a telephone call for the ostensible purpose of
proceeding with the transaction.  Pena
had the rest of the money with him.  The
group then met at a house in northeast El Paso for the purpose of counting all
of the money.  After they finished, the
group went to a Whataburger and Martinez made some
telephone calls to determine where they would meet to make the exchange.  While they waited, Martinez went over to a
red minivan which had stopped in the street. 
When he came back, Martinez told them that the marihuana would be ready
in about five minutes.  A short time
later, he made another phone call and then told Pena that they were ready.  Pena, Lawson, and Dominguez then followed
Martinez and Szczech to a location for the exchange
of the cash for marihuana.








Pena
exited the vehicle first and Dominguez followed him.  Pena walked towards a rock wall and then came
back, telling Dominguez to hurry up and get in the van so they could
leave.  Pena got back out of the van and
asked Martinez where were the drugs.  Dominguez saw two black males he had not
previously seen walk over and begin talking to Pena and asking him what was the
problem.  When Pena complained that they
were Abullshitting@ them and called them Aniggers,@
one of the black males shot Pena. 
Dominguez identified Appellant as the second black male who stood
approximately one foot away from the shooter. 
After the shooting began, Martinez jumped in his car and drove
away.  Pena crawled into the van while
Lawson drove.  Dominguez ran while the
shooter chased him.  He could both see
and hear bullets striking the road by his feet. 
Dominguez=s buttock
was grazed by a bullet but he made it to a house.  A woman opened the door and called the police
for him.  The police picked up Dominguez
and took him back to the crime scene. 
Dominguez later identified Szczech, Appellant,
and  the shooter
from photo lineups.

Derek
Kennedy and his wife, Ramona, flew to El Paso on December 11 for the purpose of
driving a rental car back to Georgia for a friend, Herman Lawson.  Kennedy knew that the vehicle would contain
marihuana but he did not know the exact amount. 
Late that same evening, Lawson called Kennedy and told him he had been
shot.  Kennedy and his wife got dressed
and drove around looking for a Pizza Hut on Dyer Street.  After getting directions, Kennedy found the
Pizza Hut and he saw paramedics at a Whataburger located
adjacent to the Pizza Hut.  Kennedy went
inside of the Whataburger and found Lawson on the
floor of the restaurant=s
kitchen being treated by the paramedics. 
Lawson, who was in pain and appeared confused, had a bullet wound in his
upper shoulder area and an exit wound in his back.  Kennedy attempted to follow the ambulance,
but police officers wanted to interview him. 
He spoke with the police officers on the scene for about forty-five
minutes and then went to the police station to give a written statement.

Police
officers discovered Pena seated in the front passenger seat of a minivan in the
Whataburger parking lot.  Officer Anthony Weathersbee
could not get a pulse so he began performing chest compressions.  After noticing his hands were wet with blood,
Weathersbee lifted Pena=s
shirt and found a small bullet hole in his chest.  Paramedics took over the efforts to revive
Pena but he died as the result of his injuries. 
During their investigation, police officers found beneath the minivan=s seat a box containing $1,000 wrapped
in a rubber band but they did not find any other money in the van.  They also found an empty gym bag, packing and
wrapping materials, boxes, and some scales. 
The back glass of the van had been shattered by gunfire.








A
few days after the shooting, the police identified Appellant as a suspect.  On December 15, 1998, Appellant waived his
Fifth Amendment rights and gave a voluntary written statement regarding the
shooting.  He stated that on the evening
of December 11 at about 10:30 p.m., a person known to him as AFesto@[2]
came to Appellant=s
home.  Festo
asked if Appellant would do something for him. 
When Appellant asked what, Festo asked
Appellant to go with him to an area in northeast El Paso known to them as Athe couch.@  He promised to give Appellant some
marihuana.  Appellant agreed and they left
the house.  As they drove to Athe couch@
in a minivan belonging to Chris Sainsbury, Festo told
Appellant that he needed for Appellant to Awatch
his back.@  Festo would not
tell him what they were going to do but simply said, AYou=ll see, you=ll see.@  When they arrived, Festo
gave Appellant an aluminum baseball bat. 
They got out of the van and Appellant hid the bat out of view behind a
rock wall.  Festo
finally told Appellant that they were there Ato
pick up Festo=s
money.@  Appellant knew that Festo
was Atalking
about ripping the money off, because he is known for that@ and Appellant had not seen any
marihuana in the van.  Appellant also
knew that Festo had a gun in his pants pocket.  He believed it was a small .38 caliber
semiautomatic weapon.  








Two
other individuals known to Appellant, Joey Martinez and Chris Szczech, arrived in a white car.  They were being followed by a minivan.  Both vehicles pulled up and parked.  The driver, a light skinned Hispanic male,
got out of the van and told Festo that they wanted to
do this quick.  Appellant saw a black
male seated in the back seat of the van. 
Another Hispanic male got out of the van.  The driver asked Festo
if he could Asee the
stuff@ but Festo insisted on seeing the money first.  The driver told Festo
that Ayour homie already saw the money and counted it.@ 
As Festo talked to the driver, Appellant had
walked over to Martinez=s
car.  The driver then walked back to his
minivan and sat on the passenger seat. 
After a few minutes of conversation between Festo
and the driver, Martinez told them to hurry. 
The driver told the other Hispanic male to get in the van.  When they refused to wait, Festo began shooting.

Appellant
began running after Martinez who had left in his car.  He saw Chris Sainsbury running up the side of
a dirt hill.  Appellant had not known
that Sainsbury was present.  Appellant
saw Festo chasing the second Hispanic male and
shooting at him.  As the van left,
gunfire struck the back glass of the window, shattering it.  Appellant ran home and did not talk to Festo until Monday, December 14.  He asked Festo why
he had shot the guy.  Festo
replied, AHe
was going to get away.@  Festo did not know
why Sainsbury had hidden.  He told
Appellant to remain calm and assured him everything would be fine.  At the conclusion of his statement, Appellant
admitted knowledge of the planned robbery but denied any intent to hurt anyone:

I want to say that
the whole incident was not suppose [sic] to happen
like that.  We were suppose [sic] to go
down there and got [sic] his money and then left but when the dude was trying
to leave that=s when
everything got messed up.  By that I mean
Festo had shot him and nobody was suppose
[sic] to get shot or die. 

 








            Two
days later, Appellant told the police he wanted to talk with them about some
matters he had left out of his first statement. 
In a second written statement, Appellant admitted that Chris Sainsbury
called him  on
December 11 at about 10:30 p.m., and asked if he could borrow a gun from Damian
McElhinny. 
Appellant told him that McElhinny would not
loan him a gun but would probably sell one. 
McElhinny refused to sell the gun to Sainsbury
but agreed to sell it to Appellant for $100. 
Sainsbury gave Appellant $100 to buy the gun.  Festo picked up
Appellant and they went to McElhinny=s house.  McElhinny required
Appellant to sign a receipt for the purchase of the black .38 automatic.  Appellant gave the gun to Festo
when they got out to the car.  When they
got back to Appellant=s
house, they telephoned Sainsbury who came over and picked up the gun.  Appellant recalled that Festo
told Sainsbury that another person they knew had some ammunition.  Appellant also admitted that he talked to
Sainsbury at Athe couch@ and asked him what he was doing
there.  Sainsbury told him that he was
watching for Martinez and the others to arrive. 


Appellant=s statement regarding the purchase of
the gun was corroborated by McElhinny=s testimony and the admission of the
receipt.  The weapon had a full clip in
it and McElhinny offered Appellant additional
ammunition for it.  He did not actually
see Appellant take the ammunition.  After
the shooting, Sainsbury asked McElhinny to report the
weapon as stolen but he refused.  Police
officers found eight live rounds in Appellant=s
closet during the execution of a search warrant.       Shortly
after the shooting, police investigators went to Athe
couch@ and
found a baseball bat leaning against a rock wall in the same manner as
described by Appellant in his first statement. 
They also found one spent .38 shell casing manufactured by Remington
Peters, the same brand as the live rounds found in Appellant=s closet.  A .38 caliber slug was removed from Pena=s body. 


At
trial, Appellant testified in his own defense. 
Asserting that both of his written statements were inaccurate, he told
the jury that he went to Athe
couch@ with Festo and Sainsbury only to smoke marihuana.  He denied knowing that Festo
or Sainsbury intended to rob anyone.  Further,
he could not hear any of the conversations between Festo
and the robbery victims.  When he heard
the gunshots, he ran away.  








A
grand jury indicted Appellant for the capital murder of Pena.  The indictment contained a second count of murder.  At trial, the State abandoned the second
count and proceeded solely on the capital murder charge.  The trial court instructed the jury on the
lesser-included offense of robbery. 
Further, the charge contained an instruction on the law of parties such
that the jury was authorized to convict Appellant as a party to the
robbery.  The jury found Appellant guilty
of the lesser-included offense of robbery. 


LEGAL SUFFICIENCY

In
his sole point of error, Appellant challenges the legal sufficiency of the evidence
to sustain his conviction of robbery.

Standard of Review

In
reviewing the legal sufficiency of the evidence to support a criminal
conviction, we must review all the evidence, both State and defense, in the
light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt. Jackson v. Virginia,
443 U.S. 307, 318‑19, 99 S.Ct. 2781, 2789, 61
L.Ed.2d 560, 573 (1979); Geesa v. State, 820
S.W.2d 154, 159 (Tex.Crim.App. 1991).  This familiar standard gives full play to the
responsibility of the trier of fact fairly to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S.Ct. at
2789, 61 L.Ed.2d at 573.  We do not resolve any conflict of fact or
assign credibility to the witnesses, as it was the function of the trier of fact to do so. 
See Adelman v. State, 828 S.W.2d 418,
421 (Tex.Crim.App. 1992);  Matson v. State, 819
S.W.2d 839, 843 (Tex.Crim.App. 1991).  Instead, our duty is only to determine if
both the explicit and implicit findings of the trier
of fact are rational by viewing all of the evidence admitted at trial in a
light most favorable to the verdict.  Adelman, 828 S.W.2d at 422.  In so doing, any inconsistencies in the
evidence are resolved in favor of the verdict. 
Matson, 819 S.W.2d at 843.   Further, the standard of review is the same
for both direct and circumstantial evidence cases.  Geesa, 820 S.W.2d at 158.








Elements of the Offense and the Law of Parties

A
person commits robbery if, in the course of committing theft as defined in
Chapter 31 of the Penal Code and with intent to obtain or maintain control of
the property, he intentionally or knowingly threatens or places another in fear
of imminent bodily injury or death.  Tex.Penal Code Ann. ' 29.02 (Vernon 1994).  Further, a person is criminally responsible
as a party to an offense if the offense is committed by his own conduct, by the
conduct of another for which he is criminally responsible, or by both.  Tex.Penal Code
Ann. ' 7.01(a)(Vernon 1994).  A
person is criminally responsible for an offense committed by another if, acting
within intent to promote or assist the commission of the offense he solicits,
encourages, directs, aids, or attempts to aid the other person to commit the
offense.  Tex.Penal Code Ann. '
7.02(a)(2).  The
application paragraph of the charge permitted the jury to convict Appellant as
a party to robbery.  








In order to establish liability as a party, it must be
shown that, in addition to the illegal conduct by the primary actor, the
accused harbored the specific intent to promote or assist the commission of the
offense.  See Lawton v. State, 913
S.W.2d 542, 555 (Tex.Crim.App. 1995); Garcia v.
State, 871 S.W.2d 279, 281 (Tex.App.--El Paso
1994, no pet.).  The evidence is
sufficient to convict under the law of parties where the defendant is
physically present at the commission of the offense and encourages its
commission by acts, words, or other agreement. 
Ransom v. State, 920 S.W.2d 288, 302 (Tex.Crim.App.)(opinion on reh=g),
cert. denied, 519 U.S. 1030, 117 S.Ct. 587,
136 L.Ed.2d 516 (1996).  The agreement,
if any, must be before or contemporaneous with the criminal event.  See Beier v.
State, 687 S.W.2d 2, 3-4 (Tex.Crim.App.
1985).  While an agreement of the
parties to act together in a common design seldom can be proved by direct
evidence, reliance may be had on the actions of the parties, showing by either
direct or circumstantial evidence, an understanding and common design to do a
certain act.  See Burdine
v. State, 719 S.W.2d 309, 315 (Tex.Crim.App.
1986), cert. denied, 515 U.S. 1107, 115 S.Ct.
2256, 132 L.Ed.2d 263 (1995); Barnes v. State, 62 S.W.3d 288, 297 (Tex.App.--Austin 2001, pet. ref=d).  Circumstantial evidence alone may be
sufficient to show that one is a party to the offense.  See Wygal v.
State, 555 S.W.2d 465, 469 (Tex.Crim.App. 1977); Barnes,
62 S.W.3d at 297.  The State must show
more than mere presence to establish participation in a criminal offense.  See Valdez v. State, 623 S.W.2d 317, 321 (Tex.Crim.App.
[Panel Op.] 1981)(opinion on reh=g). 
Nevertheless, mere presence is a circumstance tending to prove that a
person is a party to the offense, and when taken with other facts, may be
sufficient to show that he was a participant. 
See Valdez, 623 S.W.2d at 321; Barnes,
62 S.W.3d at 297.  In determining whether
an accused participated in the offense as a party, the fact finder may examine
the events occurring before, during, and after the commission of the offense.  Ransom, 920 S.W.2d at
302.

The Evidence








Taken
in the light most favorable to the verdict, the evidence showed that Appellant
had prior knowledge of the sham drug transaction and Festo=s intent to rob the victims of the money.  Appellant agreed to accompany Festo for the purpose of Awatching
his back@ during
the robbery.  Only a short time before
the robbery, he purchased a loaded weapon on behalf of Sainsbury and gave it to
Festo.  He knew
Festo had the weapon in his pocket at the scene.  Further, Appellant accepted a baseball bat
from Festo and carried it to the scene of the planned
robbery.  Based upon this evidence, a
rational trier of fact could have  found Appellant guilty of robbery as a
party.  See Barnes v. State, 56
S.W.3d 221, 238-39 (Tex.App.--Fort Worth 2001, pet.
ref=d)(in capital
murder prosecution, evidence showed an understanding and common design to
commit a robbery where defendant discussed Ahitting
a lick@ or
robbery with his accomplices, and secured a weapon and made a mask).  Appellant=s
sole point of error is overruled.  The
judgment of the trial court is affirmed.

 

September 26, 2002

                                                                         


ANN CRAWFORD McCLURE, Justice

 

Before Panel No. 1

Larsen, McClure, and Chew, JJ.

 

(Do Not Publish)











[1]  Sainsbury is
also referred to as Chris Stansbury by some witnesses.  For consistency and to avoid confusion, we
will refer to him as Sainsbury throughout the opinion.





[2]  Appellant knew
Festo=s name to be Jimil Gillian
but his legal name is Michael Jones.