David Charles HOLFORD, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–04–00195–CR.

Court of Appeals of Texas, Houston (1st Dist.).

May 12, 2005.

Discretionary Review Refused Oct. 26, 2005.

Karen Zellars, Spring, TX, for Appellant.

Eric Kugler, Assistant District Attorney of Harris County, Houston, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices HIGLEY and BLAND.

## OPINION

JANE BLAND, Justice.

A jury convicted appellant David Charles Holford of capital murder and assessed punishment at life imprisonment. On appeal, Holford contends that the trial court erred in (1) charging the jury with ambiguous application paragraphs; (2) using a disjunctive jury instruction with a general verdict; and (3) admitting autopsy photographs into evidence. We hold that the trial court did not err in charging the jury and did not abuse its discretion in admitting the photographs into evidence. We therefore affirm.

## Facts

David Holford and his co-defendant, Harold Vaughn,[1] were charged with the robbery and murder of eighteen-year-old Trevor Cook. Cook dated Gina Powell, who often visited his apartment. She sometimes would be accompanied by her friend Sheila Bricht.

Cook sold drugs out of his apartment. He kept the bathroom closet, containing his main supply of drugs, locked. Cook allowed clients to view his secondary stash of drugs, which he kept in the kitchen. It was well-known that Cook often kept $1,000 or more worth of cocaine and large sums of cash in the apartment. Cook's upstairs neighbor, Ryan Wick, advised him to be more careful about showing people his money and drugs.

Holford regularly visited Cook's apartment to buy cocaine and play video games. Vaughn sometimes accompanied Holford when visiting Cook's apartment. Vaughn was known for his aggressiveness, and he always carried a knife with him. He also sometimes carried a one-and-one-half foot long, rusty red wrench with a spike on it. Holford knew of Vaughn's temper. Although Holford had received a monetary settlement from a motorcycle accident in the summer of 2000, the money was under his parents' control, and he complained about limits on his spending.

In August 2001, Holford confided in one of his friends, Dan Dickerson, that he was thinking about "jacking" Cook or taking Cook's drugs and money. In early January 2002, Vaughn complained of his financial problems to Holford. Holford stated that he knew someone whom they could jack, but they would have to kill him.

---

1. This Court affirmed the judgment of conviction of Holford's co-defendant, Harold Vaughn, in a memorandum opinion issued on March 23, 2005 (*Vaughn v. State*, No. 01–04– 00193–CR, 2005 WL 497301 (Tex.App.-Houston [1st Dist.] 2005, no pet. h.) (mem.op.) (not for publication)).

On January 13, 2002, at approximately 3:00 p.m., Vaughn and Holford were present when Cook transacted a drug deal with one of his friends, Ronald Hornburg. Both Vaughn and Holford remained inside Cook's apartment while the transaction took place. Sometime between 3:30 and 4:00 p.m., Cook's neighbor heard the sound of Cook's gate opening and closing and saw Vaughn emerge from inside the apartment. A short time later, the neighbor heard more noises and saw both Holford and Vaughn outside Cook's apartment. Ten to fifteen minutes later, Wick heard some loud knocking on Cook's door, which continued for approximately twenty minutes.

Having unsuccessfully attempted to reach Cook since around noon that day, Powell and Bricht arrived at Cook's apartment at approximately 4:00 p.m. to return Cook's truck to his possession, which Powell earlier had borrowed. Cook did not answer his door or his cell phone. Powell noticed that Cook's bedroom window was unlatched, which she found unusual. The screen over the window was loose and fell to the floor with a mere touch. The women climbed through the window into the apartment. Upon entering Cook's apartment, the women noticed that his belongings were in disarray and that his dog was acting in a disturbed manner. The women discovered Cook lying on the living room floor in a pool of blood, and they called the police. They then ran upstairs to inform Wick of Cook's death and to obtain the correct address for the apartment.

While Bricht waited outside for the police, Vaughn walked up with two fresh scratches on his face, wearing one of Cook's shirts. Vaughn entered the apartment and viewed Cook's body, but appeared unaffected by what he saw. After saying, "I've got to get out of here," Vaughn left.

Officers James Ramsey and Janet Nederland of the Houston Police Department Homicide Division and Crime Scene Investigation unit, respectively, arrived and inspected the apartment. The investigation revealed blood on a washcloth, which DNA testing later matched to Vaughn. The investigation also revealed a broken bathroom closet door. The contents of the closet had been removed.

When Holford's friend, Dickerson, learned of Cook's death, he conveyed the information to Holford. Dickerson was shocked that Holford was unsympathetic; he heard Holford say to Vaughn, in a hushed voice, "He heard about the move," a phrase denoting some illegal activity. The next day, Dickerson called the police and told them that Vaughn and Holford were possible suspects.

Approximately a week after the murder, Christopher Vasquez, a friend of Holford's, went to Vaughn's apartment, where he saw Cook's Gucci hat and approximately fifteen lines of cocaine on the coffee table. In mid-January 2002, Holford tried to sell Cook's Gucci hat for $100 to Frederick Morris, one of his friends.

Officer Ramsey secured arrest warrants for Holford and Vaughn, and executed both of them at Vaughn's apartment. A search of the apartment revealed a loaded .380–caliber semi-automatic handgun, a Louis Vuitton wallet containing $843 in cash and Vaughn's identification, 22 butcher knives, two pocket knives, and Vaughn's tennis shoes with dried blood on both soles.

After arresting Vaughn and Holford, Officer Ramsey and his partner took the men to the Stafford Police Station for questioning. There, Vaughn revealed that he "got the best of Cook," knocked him out, and then went into the kitchen to take Cook's drugs and money. Vaughn saw Holford

cutting Cook's throat and tying a phone cord around Cook's throat, but stated that he asked Holford to stop. Vaughn conceded that he took $200 cash, drugs, clothing, and a .380 pistol from Cook. He also admitted that he drove Holford home and returned to Cook's apartment to retrieve his cell phone.

Holford told the police that while he and Vaughn were inside Cook's apartment, he was looking out of a window and heard Vaughn strike Cook with a large wrench. Holford claimed that he watched as Vaughn threw Cook around the apartment and stabbed him with a knife. Holford claims that he then followed Vaughn into the bedroom, telling Vaughn that they should get out of the apartment. Holford stated that he watched Vaughn ransack the bedroom and take clothes and drugs from it.

Holford confessed to a fellow inmate that he and Vaughn went to Cook's apartment to rob him. He told the inmate that Vaughn hit Cook, grabbed him and used a knife to cut his neck. While Vaughn used his knife, Holford hit Cook, causing Cook to fall. Vaughn ran out the door while Holford continued to hit and kick Cook. Holford told the inmate that he and Vaughn agreed that they would have to kill Cook because Cook knew them and that they could not use a gun to do it because it would be too loud.

An examination of Cook's body revealed that he had dozens of blunt-force-trauma injuries on his face and body and a recently knocked-out tooth, and that he had nearly been decapitated. Abrasions on Cook's skin, including one above his left eyebrow, were consistent with his having being struck by a wrench. A hole in Cook's right shoulder was consistent with the pointed end of the wrench's having been driven into the skin.

Holford wore shoes to his trial with soles that matched a bloody mark in Cook's kitchen. The footprint of these shoes also was consistent with stomp marks on Cook's body, made while Cook was still alive.

## Jury Instructions

Holford's first four points of error concern the trial court's instructions to the jury. In his first two issues, Holford contends that the trial judge gave ambiguous application instructions regarding the law of parties. In his third and forth issues, Holford contends that the disjunctive jury instruction denied him a unanimous verdict.

### Standard of review

When reviewing a trial court's jury instructions, we first determine whether the jury charge was erroneous. *Nguyen v. State*, 811 S.W.2d 165, 167 (Tex. App.-Houston [1st Dist.] 1991, pet. ref'd). Error occurs when a jury charge fails to directly apply the law to the facts. *Harris v. State*, 522 S.W.2d 199, 202 (Tex.Crim. App.1975). An erroneous jury charge does not result in an automatic reversal of a conviction. TEX.CODE CRIM. PROC. ANN. 36.19 (Vernon 1981); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). Not only must there be error, but a resulting harm that requires reversal must exist. *Id.* In the present case, Holford did not object to the court's charge. Reversal thus requires an error that is so egregious and created such harm that Holford was denied a fair and impartial trial. *See id.*

### Application Paragraphs with the Law of Parties

The application paragraph of a jury charge tells the jury under what circumstances it can find the defendant guilty. *McFarland v. State*, 928 S.W.2d 482, 515 (Tex.Crim.App.1996) (overruled

on other grounds by *Mosley v. State*, 983 S.W.2d 249 (Tex.Crim.App.1998)). Here, Holford's application paragraphs included the possibility of finding guilt under the law of parties. Under the law of parties, a person may be criminally responsible for the murder committed by another person if "acting with intent to promote or assist" the murder, "he solicits, encourages, directs, aids, or attempts to aid the other person" to commit the murder. *See* Tex. Pen.Code Ann. § 7.02(a)(2) (Vernon 2003).

Holford contends that the trial court instructed the jury with ambiguous application paragraphs concerning the law of parties. Holford contends that wording within these paragraphs permitted the jury to convict him as a party to capital murder if he intended to aid only in the robbery, as opposed to the required intent to aid in the murder of Cook. The two application paragraphs at issue are as follows:

> If you find from the evidence beyond a reasonable doubt that on or about the 13th day of January, 2002, in Harris County, Texas, Harold Louis Vaughn, did then and there unlawfully, while in the course of committing or attempting to commit the robbery of Trevor Cook, intentionally cause the death of Trevor Cook by cutting Trevor Cook with a deadly weapon, namely, a knife, and that the defendant, David Charles Holford, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Harold Louis Vaughn to commit the offense, if he did; or
>
> . . . .
>
> If you find from the evidence beyond a reasonable doubt that on or about the 13th day of January, 2002, in Harris County, Texas, Harold Louis Vaughn, did then and there unlawfully while in the course of committing or attempting

> to commit the robbery of Trevor Cook, intentionally cause the death of Trevor Cook by striking Trevor Cook with a deadly weapon unknown to the Grand Jury, and that the defendant, David Charles Holford, with the intent to promote or assist the commission of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Harold Louis Vaughn to commit the offense, if he did;
>
> ... then you will find the defendant guilty of capital murder, as charged in the indictment.

Holford mis-quotes these paragraphs in his brief. He erroneously substitutes the phrase "the offense of robbery" in place of "the robbery."

Both parties cite to *Barnes v. State*, 56 S.W.3d 221 (Tex.App.-Fort Worth 2001, pet. ref'd) as persuasive authority. The application paragraph in *Barnes* instructed the jury that the defendant was guilty of the offense of capital murder if it found "from the evidence beyond a reasonable doubt that on or about the 11th day of October, 1997, in Tarrant County, Texas, Carlis Russell, did intentionally cause the death of an individual, [C.H.], by shooting her with a deadly weapon, to-wit: a firearm, and the said Carlis Russell was then and there in the course of committing or attempting to commit the offense of robbery of [C.H.], and [appellant], acting with the intent to promote or assist *the commission of the offense of capital murder*, if any, solicited, encouraged, directed, aided or attempted to aid Carlis Russell *in the commission of the offense*." *Id.* at 235 (emphasis in original).

The *Barnes* court found that the trial court properly instructed the jury, by requiring it to find that defendant assisted in the murder and not just in the robbery. The court noted that the prepositional phrase "in the commission of the offense"

referred to the previous phrase "the offense of capital murder." *Id.*

Here, as in *Barnes,* the charge describes the capital murder as necessarily occurring "while in the course of committing or attempting to commit the robbery." Unlike *Barnes,* the charge does not refer to the robbery as "the offense." Rather, the charge requires the jury to find that Holford promoted or assisted Vaughn in intentionally causing the death of Cook, while in the course of committing or attempting to commit robbery. Read logically, the prepositional phrase "with the intent to promote or assist the commission of the offense" refers to Cook's murder, that occurred "while in the course of committing or attempting to commit the robbery." Likewise, the clause "solicited, encouraged, directed, aided or attempted to aid Harold Louis Vaughn to commit the offense" refers to Cook's murder.

 Furthermore, any error in the application paragraphs could not have caused Holford "egregious harm," a requirement because Holford did not object to the instruction. To determine whether a defendant has sustained egregious harm from an un-objected to instruction, we consider (1) the entire charge; (2) the state of the evidence, including contested issues; (3) arguments of counsel; and (4) any other relevant information. *Hutch v. State,* 922 S.W.2d 166, 171 (Tex.Crim.App.1996).

In the present case, the jury charge read in its entirety clearly instructed the jury that, before it could find Holford guilty under the theory of the law of parties, it had to find that he participated and intended both the robbery and the murder. For instance, the paragraph immediately preceding the application paragraphs cautioned the jury that these elements were necessary:

> Before you would be warranted in finding the defendant guilty of capital mur-

der, ... you must find from the evidence beyond a reasonable doubt that the defendant, *David Charles Holford, with the intent to promote or assist in the commission of the offense of robbery, if any, solicited, encouraged, directed, aided, or attempted to aid Harold Louis Vaughn in cutting or striking Trevor Cook, if he did, with the intention of thereby killing Trevor Cook....*

(Emphasis added).

Second, counsel for both the State and Holford argued to the jury that in order to convict Holford, it must find that Holford intended Cook's murder. Finally, the State presented ample evidence to convict Holford and Holford has not challenged the sufficiency of that evidence. We hold that, even if the trial court erred in the wording of the application paragraphs, the error is not egregious.

*Disjunctive Jury Charge*

 In his third and forth issues, Holford contends that a disjunctive jury charge with a general verdict form deprived him of a unanimous finding, because it is possible that some of the jurors did not unanimously agree on the underlying theories of the State's case.

 In reviewing a disjunctive jury charge, we first determine whether the separate application paragraphs contain different criminal acts or whether they merely instruct as to different means of committing a single offense. If the disjunctive paragraphs contain different criminal acts, then the jury must be instructed that it cannot return a guilty verdict unless it agrees *unanimously* that the defendant committed one of the acts. *Ngo v. State,* No. PD–0504–04, 2005 WL 600353, *3 (Tex.Crim.App., March 16, 2005) (designated for publication) (holding that because defendant was charged with three different criminal acts of credit card abuse, jury

had to unanimously agree that defendant did at least one of three different things: steal the credit card, knowingly receive the stolen credit card, or fraudulently present stolen credit card with intent to obtain benefit). If the disjunctive paragraphs merely inform of different means of committing a single offense, then the jury does not have to unanimously agree on which alternative means the defendant used to commit the offense. *Kitchens v. State*, 823 S.W.2d 256 (Tex.Crim.App.1991). In determining whether the paragraphs are separate criminal acts or separate means of committing one act, "[a] handy, though not definitive, rule of thumb is to look to the statutory verb defining the criminal act." *Ngo*, 2005 WL 600353 at *4 n. 24.

The facts here are similar to those in *Kitchens v. State*, 823 S.W.2d 256 (Tex. Crim.App.1991). In *Kitchens*, the jury charge presented two alternative theories of capital murder—one in the course of aggravated assault and the other in the course of robbery. The Court of Criminal Appeals held that if alternative theories of the same offense are submitted to the jury in the disjunctive, then the jury may return a general verdict as long as the evi-

dence is sufficient to support a finding under any of the theories submitted. *Id.* at 258. No general requirement exists that the jury reach agreement on the preliminary factual issues that underlie the verdict. *Id.* at 259.

Likewise, in *Schad v. Arizona*, 501 U.S. 624, 642–44, 111 S.Ct. 2491, 2502–03, 115 L.Ed.2d 555 (1991), the United States Supreme Court concluded that it is not unconstitutional to instruct a federal jury that it could find a defendant guilty of felony murder or premeditated murder within a single guilty verdict form.[2] No general requirement exists as part of the due process clause that a jury agree on the preliminary facts underlying a verdict. *Id.*[3]

Here, Holford is charged with committing capital murder. The application paragraphs permitted the jury to find Holford guilty upon finding that: (1) he committed the capital murder; or (2) Vaughn committed the murder, and Holford was criminally responsible for it under either the law of parties or as a conspirator. *See* TEX. PEN. CODE ANN. §§ 7.02(a)(2), 7.02(b). Only one statutory verb defines the criminal act—causing the death of Cook during a rob-

---

2. Holford generally contends that the Fourteenth Amendment to the United States Constitution guarantees him a unanimous verdict. Holford fails to present any argument to support this contention other than to state that "the United States Supreme Court has not directly addressed the issue of the due process clause as it relates to [his] unanimity issue." We note that the Court of Criminal Appeals has held that "the Texas requirements for a unanimous jury verdict 'are not identical to the requirements under federal law.'" *Ngo v. State*, No. PD–0504–04, 2005 WL 600353, *3 n. 24 (Tex.Crim.App., March 16, 2005) (designated for publication) (quoting *Francis v. State*, 36 S.W.3d 121, 125 n. 1 (Tex.Crim.App. 2000) (Womack, J. concurring)). Therefore, in order to address Holford's Fourteenth Amendment argument, our discussion includes an analysis under federal law.

3. We acknowledge that, in *Ngo*, the Court of Criminal Appeals observed that the United States Supreme Court distinguished *Schad* in *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). In *Richardson*, the Supreme Court held that the federal continuing criminal enterprise statute requires jurors to agree unanimously upon which acts—or drug sales—the defendant committed. In so holding, the Court confirmed that a jury in a robbery case does not have to agree on the underlying facts, such as whether the defendant used a knife or a gun to create a threat, as long as it agrees that the defendant threatened to use force. *Id.* at 817, 119 S.Ct. 1707 (discussed in *Ngo*, 2005 WL 600353 at *5 n. 31). In this case, however, as in *Kitchens* and *Schad*, the disjunctive paragraphs concern only one *actus reus*.

bery. Each of the disjunctive paragraphs thus describes a different means of committing the same act. The paragraphs instructing on conspiracy and law of parties include a transferred intent as a potential means of committing the offense, but the transferred intent ultimately relates to the same *actus reus*. Here, as in *Schad* and *Kitchens*, the *actus reus* of Holford's offense was murder. We hold that the trial court's instructions require the jurors to agree that Holford committed that single act (either directly or via transferred intent), and thus the trial court did not err in failing to instruct the jury that it must agree unanimously on the manner of Cook's murder.

Holford attempts to distinguish *Kitchens* by contending that it did not involve erroneous application paragraphs. We have held that the trial court did not err in its submission of the application paragraphs, thus this distinction is without merit. Moreover, Holford's complaint about the application paragraphs does not attack the use of the alternative theories of the means of the murder. Instead, he complains that "offense" was ambiguous as to its antecedent.

The trial court instructed the jury to find Holford guilty if he committed one act and one offense—the capital murder of Cook. The State's case presented alternative theories of the method Holford used to commit the offense, and the State offered evidence to convict Holford based on each alternative. On appeal, Holford has not challenged the sufficiency of that evidence in any respect. We hold that the trial court did not err in submitting a disjunctive jury charge with a general verdict for the single offense of capital murder.

## Admissibility of Autopsy Photographs

In his last issue, Holford contends that the trial court abused its discretion in admitting three colored autopsy photographs: State's Exhibit 305 (a photograph of the decedent's brain after the skull had been cut open) and State's Exhibits 318 and 319 (photographs of the decedent's lung).[4] Holford contends that the photographs were not helpful to the jury in resolving any contested issues of fact. Moreover, he contends that any probative value of the photographs substantially is outweighed by their prejudicial impact on the jury.

*Standard of Review*

 The trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g).

*Standard to Admit Photographs*

 As a general rule, a photograph is admissible if it is relevant to a material issue and is an accurate representation of its subject as of a given time. *DeLuna v. State*, 711 S.W.2d 44, 46 (Tex. Crim.App.1986). Generally, relevant evidence may be excluded if its probative value substantially is outweighed by the danger of unfair prejudice. Tex.R. Evid. 403. We apply Rule 403 to these photographs and determine whether they assist the jury with its decision of guilt and are relevant, legitimate and logical to the testimony that they accompany. If helpful, photographs are admissible unless "the emotional and prejudicial aspects substantially outweigh the helpful aspects." *Era-*

---

4. At trial, Holford "generally" objected to the admissibility of twenty-six autopsy photographs, but focused only on three of them. On appeal, Holford discusses these three photographs only. Holford thus has waived his appeal as to the remaining photographs, because he failed to present any argument or authority to this court. Tex.R.App. P. 38.1(h).

*zo v. State,* 144 S.W.3d 487, 491–92 (Tex. Crim.App.2004).

*State's Exhibit 305, 318 and 319*

 Holford contends that State's Exhibits 305, 318, and 319 could not have been helpful to the jury because he did not dispute the severity of the injuries or the cause of Cook's death. Holford did not need to dispute these facts to make the photographs probative. First, the autopsy photographs are material to the trial because they show Cook's injuries. *See id.* 144 S.W.3d at 494 (finding photographs could be helpful to juries, in part, because they show wounds suffered by victim for whose death defendants were on trial). Second, with Holford's consent, the State presented the direct examination of most of its witnesses simultaneously before both Holford's and Vaughn's juries.[5] The medical examiner testified, and introduced his autopsy photographs, before both juries. Therefore, in determining the relevancy of these photographs, we look to the issues raised in both Holford's and Vaughn's trials.

The medical examiner used the photographs of the decedent's lung (State's Exhibits 318 and 319) to illustrate that the stab wounds in Cook's back were deep enough to puncture his lung. He also used these photographs to illustrate the discoloration caused by the blood inhaled into the lung, a sign that Cook was alive when his throat was cut.

The medical examiner used the photograph of Cook's brain inside the skull (State's Exhibit 305) to illustrate multiple areas of bleeding, bruising and hemorrhaging on the undersurface of the decedent's scalp, matching the injuries on Cook's

head. He also used this photograph to illustrate that the brain was surrounded by collections of blood, supporting his opinion that the trauma to Cook's head could have been the cause of his death. Evidence that trauma to Cook's head was severe enough to kill him was relevant because Vaughn told the police that although he "knocked" Cook out, Holford cut Cook's throat.

 We conclude that the autopsy photographs were probative of the nature of the injuries to Cook and that they were helpful to the jury in determining Holford's and Vaughn's participation in Cook's death. We next determine whether the prejudicial effect of the three photographs substantially outweighs their relevance. TEX.R. EVID. 403. We consider the probative value of the evidence, the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way, the time that the proponent needs to develop the evidence, and the proponent's need for the evidence. *Erazo,* 144 S.W.3d at 489. In the context of photographs, we also consider the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up shots or of the whole body, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Id.* at 489 (citing *Narvaiz v. State,* 840 S.W.2d 415 (Tex.Crim.App.1992)).

 Autopsy photographs generally are admissible unless they depict mutilation of the victim caused by the autopsy itself. *Rojas v. State,* 986 S.W.2d 241, 249 (Tex.Crim.App.1998). When photographs

---

5. The trials of Holford and his co-defendant were partly consolidated. By agreement of the parties, separate juries were impaneled. The direct examination of most of the State's witnesses was heard by both juries even though each defendant conducted cross-examination before only his own jury.

depict internal organs that have been removed to portray the extent of the injury to the organs themselves, the photographs are not considered to be depictions of mutilation of the victim by autopsy. *Salazar v. State*, 38 S.W.3d 141, 151–52 (Tex.Crim. App.2001).

Here, the three photographs were admitted during the medical examiner's testimony. Such testimony constituted less than two out of the fifty-four pages of the medical examiner's direct testimony, and out of the six volumes of testimony in the record—not an unreasonable amount of time.

The photographs are not particularly gruesome or emotionally charged, when compared with photographs, admitted into evidence without objection, of the crime scene, showing a nearly decapitated and badly beaten body in a pool of blood. The autopsy photographs are not large: they are approximately three and one-half by five inches in size. None of the photographs at issue show Cook's entire body. The photographs show only minimal damage caused from the autopsy. *See Prible v. State*, No. AP–74487, 2005 WL 156555, at *10 (Tex.Crim.App. Jan. 26, 2005) (designated for publication) (disembodied organs are not highly emotional, they are clinical).

The photographs are three in number. Although Cook's death was one of the more traumatic ones that the medical examiner had seen, the State introduced only twenty-five photographs. The medical examiner testified that out of the numerous photographs taken, he chose those which best show the injuries to Cook. He further stated that they were necessary to show to the jury the nature of the decedent's injuries. We conclude that the probative nature of State's Exhibits 305, 318, and 319 is not substantially outweighed by any prejudicial effect. The trial court thus did not abuse its discretion in admitting the autopsy photographs into evidence.

### Conclusion

We conclude (1) the application paragraphs of the charging instructions are not ambiguous and, even if they are, the instructions did not result in egregious harm to the defendant; (2) the disjunctive charging instructions did not deny Holford a unanimous verdict; and (3) the trial court did not error in admitting autopsy photographs into evidence. We therefore affirm the judgment of the trial court.