**Opinion issued April 3, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00549-CR**

———————————

**VINCENT HARRIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Case No. 1716998**

---

**MEMORANDUM OPINION**

Appellant Vincent Harris was convicted of murder involving a shooting and sentenced to sixty years' imprisonment. In three issues, Harris challenges his conviction based on an alleged violation of the Confrontation Clause involving admission of evidence and jury-charge error. We affirm.

## I.  Background

On the evening of September 11, 2020, Daniel Partida, who had recently been discharged from a halfway house, consumed alcohol and illegal drugs before falling asleep at a bus stop with his possessions nearby in plastic bags.  These possessions were stolen and brought to a nearby Citgo gas station where they were placed inside the station's food mart.  A group of men, including Harris (who is also known as Airline Lil Mac), gathered at the Citgo station that evening and into the early hours of September 12, 2020.  Harris and his acquaintance Cornelius Watson[1] placed handguns inside the Citgo station's food mart, as captured by video cameras.

When he awoke, Partida saw that his possessions, including his wallet and cell phone, were missing and went to the Citgo station to find them.  The men at the Citgo station did not return the possessions, but some of them, including Ricky Nacoste, assaulted Partida.  Partida then left.  Harris testified that he approached the fight and told the men to leave Partida alone and not take advantage of him, but that Partida "cussed" at Harris and stated he was going to "get his stuff back by any means."  Harris's account that he was acting altruistically in trying to help Partida

---

[1]     Our court previously affirmed Watson's murder conviction involving the same events as this case.  *See Watson v. State*, No. 01-23-00172-CR, 2024 WL 3350262 (Tex. App.—Houston [1st Dist.] July 9, 2024, no pet.) (mem. op., not designated for publication).

was contradicted by video showing that, after this confrontation, Harris was laughing and reenacting the fight.

Around an hour later, Partida returned to the Citgo station. Partida testified he did not have any weapon at any point that night and returned to the station because he needed his possessions. According to Harris, Partida declared that, if his possessions were not returned, "he was going to call his people and they were going to shut this bitch down," which Harris took to be a threat of violence. But Partida testified his cell phone had been stolen and he could not make any calls.

Nacoste again started fighting Partida. Harris testified he tried to stop the fight because he was concerned "one of them could hit their head the wrong way and die." Nonetheless, Harris eventually joined the fight and admitted he was punching at Partida as he was trying to walk away. Harris admitted Partida did not have a weapon and that Harris could have stopped fighting and returned to the Citgo station. The fighters moved into the street and then into the parking lot of a Shell station across from the Citgo station. Around that time, Jarmel Joiner, who was in a wheelchair, traveled by the scene. Harris knew Joiner as someone who frequents the area and washes car windows to make money.

At the time of this fight, Ingrid Ramirez was riding in a truck with her husband, coming from the other side of a highway overpass that ran parallel to the Citgo and Shell stations. They came to a stop at a traffic light on the side of the

3

overpass where the Citgo and Shell stations were located. At that point, Ramirez saw Partida fighting with Nacoste. Ramirez believed Nacoste was the aggressor in the fight because Partida was moving backward and appeared to be losing. Ramirez observed the fight move across the road into the median, during which time Harris joined Nacoste in fighting Partida. She then saw the fight move into the Shell station parking lot.

While Harris and Partida were fighting in the Shell station parking lot, a blue car pulled up to the men for about five seconds. Describing video from the Shell station, a law-enforcement officer testified that Harris appeared to gesture to the car to "get out of here." Partida testified that it was a "random vehicle," whereas Harris testified it appeared the driver of the blue car knew Partida.

Harris initially testified that the driver of the blue car jumped out of the car, but then clarified the driver only partially came out of the car and reached for a handgun. According to Harris, a female passenger in the blue car prevented the driver from exiting. Harris claims he told the driver to take Partida and leave, but the driver stated, "[A]nybody standing on the corner fixing to get it."

Ramirez also observed the blue car pull up to the men, where she says an occupant spoke to Partida for two or three seconds. Ramirez saw the car then make a U-turn out of the Shell station, drive under the overpass, and turn left to get onto the feeder road on the other side of the overpass; she did not see the blue car again.

4

Ramirez did not see anyone in the blue car display a weapon, although she admitted she could not tell if they were armed or not.

As the blue car began to leave, Harris and Watson ran back to the Citgo station food mart. Partida followed them, and Joiner was still nearby. Harris and Watson emerged from the food mart holding guns. Harris claims he was retrieving his gun to defend himself and others because of the threat made by the driver of the blue car. However, Harris conceded that nothing prevented him or others from leaving the area or taking cover inside the Citgo station food mart.

At this point, Partida and Joiner turned around and started traveling away from the Citgo station with their backs to the store. Harris and Watson followed in the direction of Partida and Joiner and began shooting once they reached the adjacent street. According to Harris, he saw the blue car had made a U-turn on the other side of the overpass and was moving around three miles per hour. Harris claims that the driver of the blue car then fired two shots from a gun inside the car. Harris testified he told Watson, "[T]hey're shooting at us," so he and Watson defensively returned fire. Harris stated there was a gap of about two to three seconds between when the driver of the blue car fired shots and when Harris and Watson returned fire.

During this time, Ramirez and her husband were parked in the Shell station parking lot with a good view of the shooting events. Ramirez testified she saw Harris and Watson fire shots in the direction of Partida and Joiner, who were around five

5

feet apart from each other and still had their backs to Harris and Watson. Ramirez testified she was one-hundred percent sure that the men shot in the direction of Partida and Joiner.[2] Ramirez stated they fired more than ten shots, and she did not hear any other gunshots.

An investigating officer testified that law enforcement spoke to multiple witnesses following the shooting, and the witnesses' statements were generally consistent except from one witness who stated the men were "shooting at a car near the underpass."

During the shooting, Joiner was hit by a bullet and died quickly thereafter. Harris and Watson returned to the Citgo station, and Harris left in a vehicle that sped past Joiner's body on the street. Watson left the scene on foot. Ramirez called 911 to report that Joiner had been shot. Ramirez's husband checked Joiner for a pulse and determined he was dead.

---

[2] On appeal, Harris contends Ramirez conceded her trial account of the shooting was inconsistent with her original account when she told officers the shooters were shooting in the direction of the blue car. Ramirez did not make such a concession.

During cross-examination at trial, Ramirez remained adamant that Harris and Watson were shooting in the direction of Partida and Joiner, not the blue car. She was then shown a transcript of a hearing from February 2023 where she apparently may have said it was possible they were shooting in the direction of a car. However, on re-direct examination, she explained she corrected the questioner in the prior hearing by explaining she did not say it was possible the men shot in the direction of a car.

Harris did not attempt to aid Joiner or communicate with police despite knowing within a few minutes of the shooting that Joiner had died. Harris also could not produce his gun at trial, claiming he had his then-girlfriend keep it to use to exonerate him should he become a suspect in the shooting, but explaining he does not communicate with her anymore.

Fourteen shell casings were found near where Joiner was shot. Forensics established that the casings came from two guns, one that fired 9 mm ammunition, and one that fired .380 caliber ammunition. Harris testified his gun was a .380 caliber. A crime-scene investigator testified she searched the area under the overpass and did not see any casings in that area. Trial witnesses testified that casings can be moved as cars drive over them and that casings will stay inside a gun if a revolver is used or stay inside a car if the gun was fired while inside the car.

The investigation eventually led to Harris and Watson, both of whom were indicted for murder. At trial in Harris's case, he admitted the first time he told his self-defense story was during the trial. He conceded he lied in January 2021 when he told police he knew nothing about the shooting, and he recognized he did not tell police about the blue car and his alleged self-defense story. Additionally, Harris admitted that, when speaking on the phone to a friend in April 2023 about the charges, Harris stated, "I know it's my fault. I ain't gonna never blame it on any other person. It's my fault, but damn."

The jury charge contained several disjunctive application paragraphs regarding alternative theories for how Harris was responsible for Joiner's murder. The charge also submitted defensive instructions that required acquittal if the jury found, or had a reasonable doubt as to whether, Harris reasonably believed the use of deadly force was immediately necessary to protect himself or a third person from another's use or attempted use of unlawful deadly force. These instructions further provided that the use of force is not justified in response to verbal provocation alone, and that a person who did not provoke the other person against whom deadly force is used, and who was not engaged in criminal activity at the time the deadly force is used, is not required to retreat before using deadly force.

During closing arguments, Harris argued he acted in defense of himself and others when he lawfully fired shots in response to the driver of the blue car shooting. Harris also argued that the driver of the blue car may have shot Joiner. The State argued Harris was guilty of murder because the evidence refuted the story he fabricated to justify Joiner's shooting. The State further contended that, even if the jury believed Harris's story, he was not entitled to acquittal based on defense of himself or others because the driver of the blue car engaged in mere verbal provocation and Harris provoked the situation.

The jury unanimously found Harris guilty of murder, and the trial court sentenced him to sixty years' imprisonment. Harris now appeals.

8

## II.     Confrontation Clause

In his first issue, Harris contends that admission of the report regarding Joiner's autopsy, and testimony about the report, violated Harris's right to confrontation under the Sixth Amendment, requiring reversal. We disagree.

### A.     Legal standards

The Sixth Amendment to the United States Constitution—the Confrontation Clause—provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. "The main purpose behind the Confrontation Clause is to secure for the opposing party the opportunity of cross-examination because that is 'the principal means by which the believability of a witness and the truth of his testimony are tested.'" *Johnson v. State*, 490 S.W.3d 895, 909 (Tex. Crim. App. 2016) (citation omitted).

To implicate the Confrontation Clause, an out-of-court statement must (1) have been made by a witness absent from trial and (2) be testimonial in nature. *Henriquez v. State*, 580 S.W.3d 421, 427 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). If those initial requirements are met, the statement is admissible and does not violate the Confrontation Clause only if (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant. *Id.* "An autopsy report is considered testimonial when an objective medical examiner would

9

reasonably believe that the report would be used in a later prosecution." *Id.* at 427–28.

In assessing the harm arising out of a violation of constitutional rights, we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. TEX. R. APP. P. 44.2(a). The critical inquiry is not whether the evidence supported the verdict absent the erroneously admitted evidence, but rather the likelihood that the constitutional error was a contributing factor in the jury's deliberations. *Henriquez*, 580 S.W.3d at 429 (citations and quotations omitted). When reviewing harm for violations of the Confrontation Clause, we consider: (1) how important the out-of-court statement was to the State's case; (2) whether the out-of-court statement was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the out-of-court statement on material points; and (4) the overall strength of the prosecution's case. *Gutierrez v. State*, 516 S.W.3d 593, 599 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd).

**B.    Analysis**

Tabitha Ward, M.D. performed the autopsy of Joiner, and Lucile Tennant, M.D. reviewed the report. At trial, Dr. Ward and Dr. Tennant were not available to testify, so the State called Ana Lopez, M.D. to testify about the autopsy and the manner of Joiner's death. Harris objected to admission of the autopsy report and Dr.

10

Lopez's testimony because Dr. Lopez was not involved in the autopsy, meaning Harris was unable to cross-examine the doctors who actually performed the autopsy, violating his right to confrontation. The trial court overruled the objection and admitted the autopsy report.

Dr. Lopez testified that she is a board-certified forensic pathologist who has performed over 5,000 autopsies. Dr. Lopez reviewed the autopsy photographs, the crime-scene photographs, and the findings of Dr. Ward and Dr. Tennant as stated in their autopsy report. Dr. Lopez agreed with the autopsy-report findings that Joiner was shot in the right side of his back from a distance of greater than 2.5-to-3 feet, and the bullet exited the left side of his body near the chest. But Dr. Lopez also testified she independently observed the gunshot wounds in the autopsy photographs (which were admitted into evidence without objection[3]), and she explained why the wound on Joiner's back was the entry wound and the wound near the left side of his chest was the exit wound. During cross-examination, Dr. Lopez went over the autopsy photographs again and explained in detail why the back wound is an entry

---

[3]    The photographs admitted into evidence were of Joiner's body, and specifically his gunshot wounds, before any autopsy-related cutting began. "[A]utopsy photographs are considered nontestimonial in nature and do not implicate the Confrontation Clause." *Henriquez*, 580 S.W.3d at 428.

wound because it is a circular wound with a rim of abrasion, and the front wound is an exit wound because it is slit-shaped and does not have a rim of abrasion.

Assuming the autopsy report was testimonial in nature, and assuming admission of the report and Dr. Lopez's testimony about the report violated the Confrontation Clause, we hold the violation was not harmful. Harris argues the autopsy report and Dr. Lopez's testimony about the report were "crucial evidence for the State" because they detailed that Joiner was shot in the right side of his back, with the bullet exiting the left side of his chest. Harris contends this was important for the State to prove because there was a "valid disagreement about the trajectory of the bullet" and it was unknown what caliber gun fired the bullet and from how far. But the autopsy report simply describes the bullet's path through Joiner's body and does not pertain to where the shooter was aiming when the fatal shot was fired, where Joiner was facing at the time of the shooting, or what the bullet's caliber was. Moreover, Harris argued during trial and argues on appeal that the trajectory of the bullet path as described in the autopsy report *is consistent* with the defense theory that Harris and Watson fired at the blue car in self-defense—meaning, per Harris, the autopsy report aided his defense.

Harris also argues "Dr. Lopez could only parrot Dr. Ward's conclusions from the autopsy report," but that is wrong. Based on the photographs, Dr. Lopez was

able to explain independent of the autopsy report why the bullet wound on Joiner's back was the entry wound, and the wound to the left of his chest was the exit wound.

Accordingly, the autopsy report was not critical to the State's case but set forth an uncontested fact[4] of where the bullet entered and exited Joiner's body and was cumulative of Dr. Lopez's testimony regarding her own review of the photographs. Moreover, Harris argued that the autopsy report supported his theory of self-defense. Based on the relevant considerations, we conclude beyond a reasonable doubt that any Confrontation Clause violation stemming from admission of the autopsy report and testimony did not contribute to Harris's conviction. *See* TEX. R. APP. P. 44.2(a); *Henriquez*, 580 S.W.3d at 429–30 (concluding error was harmless because autopsy report added little beyond autopsy photographs and testifying doctor's testimony based on her independent review, both of which were properly admitted). We overrule Harris's first issue.

### III. Jury Charge

In his second issue, Harris argues that trial court erred by denying his request to modify language in the jury charge stating that the jury's duty was to determine

---

[4] Some of the emergency and law-enforcement personnel who came to the scene of the shooting noted the wound near the left side of Joiner's chest was the entry wound. However, these personnel admitted their preliminary belief was merely a guess and they would defer to the medical examiner's opinion. Harris did not argue at trial that the front wound was the entry wound but adopted Dr. Lopez's opinion that the back wound was the entry wound.

"guilt or innocence." In his third issue, Harris contends the disjunctive application paragraphs in the jury charge allowed him to be convicted by a non-unanimous verdict in violation of the Texas Constitution.

## A. Legal standards

We review alleged charge error by first determining whether error exists in the charge. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If error exists, we analyze the harm resulting from the error to determine whether reversal is required and apply separate standards of review depending on whether the defendant timely objected to the jury instructions. *Id.*; *see also Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016).

The purpose of the jury charge is to instruct the jurors on the law applicable to the case. *See* TEX. CODE CRIM. PROC. art. 36.14; *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). The abstract portion of the court's charge sets forth the law in general terms, including statutory definitions and offense elements. *See Vasquez*, 389 S.W.3d at 366–67. The application paragraphs then apply that law to the particular facts. *Id.* A jury charge that improperly states the law or the elements of an offense is erroneous. *Hollins v. State*, No. 01-22-00776-CR, 2024 WL 4982504, at *8 (Tex. App.—Houston [1st Dist.] Dec. 5, 2024, no pet. h.) (mem. op., not designated for publication).

**B.      There is no jury-charge error regarding "guilt or innocence"**

Regarding Harris's second issue, the charge provided, "Your sole duty at this time is to determine the guilt or innocence of the defendant under the indictment in this cause and restrict your deliberations solely to the issue of guilt or innocence of the defendant." Harris's counsel argued this was a misstatement of the law because the jury does not consider whether a defendant is innocent. Harris's counsel asked the trial court to modify the language to read, "Your sole duty at this time is to determine whether the State has proved the elements under the indictment in this cause beyond a reasonable doubt and restrict your deliberations solely to that issue." The trial court denied this request.

Our sister court has previously held that this exact same instruction is not improper but tracks the requirement in the Texas Code of Criminal Procedure that the jury first consider "the issue of guilt or innocence of the defendant" before the punishment phase of trial. *Avila v. State*, 15 S.W.3d 568, 576 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (quoting TEX. CODE CRIM. PROC. art. 37.07, § 2(a)). The court further explained that there was no risk that this instruction could mislead or confuse the jury into believing the defendant had the burden to prove his innocence because other instructions in the charge made it clear the "*law does not require a defendant to prove his innocence or produce any evidence at all.*" *Id.* (emphasis in original). The charge here similarly contained instructions making it clear that

Harris was presumed innocent and had no burden to prove his innocence. The trial court did not err in rejecting Harris's proposed instruction. We overrule Harris's second issue.

## C.    There is no jury-charge error regarding unanimity

Regarding Harris's third issue, the indictment charged him with two alternative theories for Joiner's murder, first for intentionally and knowingly causing Joiner's death by shooting him with a firearm, and second for intending to cause serious bodily injury to Joiner and causing his death by intentionally and knowingly committing an act clearly dangerous to human life by shooting him with a firearm. *See* TEX. PENAL CODE § 19.02(b)(1), (2).

The jury charge authorized conviction pursuant to three application paragraphs as follows: (1) on a finding beyond a reasonable doubt (a) that Harris intentionally and knowingly caused Joiner's death by shooting him with a firearm *or* (b) that Harris was criminally responsible as a party by promoting or assisting Watson, who intentionally and knowingly caused Joiner's death by shooting him with a firearm; *or* (2) on a finding beyond a reasonable doubt (a) that Harris intended to cause serious bodily injury to Joiner and did cause his death by intentionally and knowingly committing an act clearly dangerous to human life by shooting him with a firearm *or* (b) that Harris was criminally responsible as a party by promoting or assisting Watson, who intended to cause serious bodily injury to Joiner and did cause

his death by intentionally and knowingly committing an act clearly dangerous to human life by shooting him with a firearm; *or* (3) on a finding beyond a reasonable doubt that Harris, acting alone *or* with Watson as a party, intentionally and knowingly shot a firearm at a known or unknown person or persons, intending or knowing that serious bodily injury or death would occur to that person or those persons, and hit Joiner, causing his death. Thus, the jury charge submitted both indicted theories for Joiner's murder and allowed for Harris's conviction under law-of-parties and transferred-intent theories. *See* TEX. PENAL CODE §§ 6.04(b)(2) (transferred intent), 7.01–.02(a)(2) (law of parties).

"When alternate theories of committing the same offense are submitted to the jury in the disjunctive, it is appropriate for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the submitted theories." *Lazarine v. State*, No. 01-19-00982-CR, 2021 WL 5702182, at *4 (Tex. App.—Houston [1st Dist.] Dec. 2, 2021, pet. ref'd) (mem. op., not designated for publication). This applies when alternative theories for committing murder are submitted because "the theories are alternative manners and means of committing the offense of murder, rather than distinct offenses." *Braughton v. State*, 522 S.W.3d 714, 727–28 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 659 S.W.3d 592 (Tex. Crim. App. 2019). It also applies when application paragraphs authorize a murder conviction based on law-of-parties and transferred-intent theories because they are

17

likewise alternative manners and means of committing murder. *See Holford v. State*, 177 S.W.3d 454, 463 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (pertaining to the law of parties); *see also Small v. State*, No. 01-14-00421-CR, 2016 WL 4126725, at *17 (Tex. App.—Houston [1st Dist.] Aug. 2, 2016, pet. ref'd) (mem. op., not designated for publication) (explaining section 6.04(b)(2) authorizes a murder conviction when defendant kills a person different than the person he intended to kill).

In *Holford*, we determined disjunctive application paragraphs involving a murder charge and the law of parties did not violate the unanimity requirement:

> Each of the disjunctive paragraphs thus describes a different means of committing the same act. The paragraphs instructing on conspiracy and law of parties include a transferred intent as a potential means of committing the offense, but the transferred intent ultimately relates to the same *actus reus*. . . . [T]he *actus reus* of Holford's offense was murder. We hold that the trial court's instructions require the jurors to agree that Holford committed that single act (either directly or via transferred intent), and thus the trial court did not err in failing to instruct the jury that it must agree unanimously on the manner of [decedent's] murder.

177 S.W.3d at 463; *see also Sanchez v. State*, No. 03-13-00050-CR, 2013 WL 4487562, at *6 (Tex. App.—Austin Aug. 15, 2013, pet. ref'd) (mem. op., not designated for publication) ("[The Court of Criminal Appeals] makes it clear that multiple theories of party liability under section 7.02 may be listed disjunctively in the jury charge without running afoul of the constitutional unanimity requirement.").

18

Harris relies on inapplicable cases in which the jury charge erroneously did not require unanimity regarding the specific offense committed or the specific incident that constituted commission of the offense. *See Stuhler v. State*, 218 S.W.3d 706, 716–20 (Tex. Crim. App. 2007) (concluding unanimity required for type of "injury to a child" committed); *Ngo v. State*, 175 S.W.3d 738, 741 (Tex. Crim. App. 2005) (concluding unanimity required for specific incident of "credit card abuse" committed); *Francis v. State*, 36 S.W.3d 121, 122–25 (Tex. Crim. App. 2000) (concluding unanimity required for specific incident of "indecency with a child" committed). Here, the charge required unanimity regarding the offense committed and the incident that constituted commission of the offense, specifically Joiner's murder by shooting.

Accordingly, for each theory that was submitted in the present case, the criminal act was the same—Joiner's murder. Harris cannot avoid criminal responsibility for Joiner's murder merely because Watson, whom Harris was aiding, fired the fatal shot, or because Harris and Watson intended to shoot another person when one of them shot Joiner. The charge required the jury to unanimously find beyond a reasonable doubt that Harris was responsible for causing Joiner's murder by shooting, albeit via alternative theories regarding the means and modes of committing the murder, and thus satisfied the Texas Constitution. *See Hernandez v. State*, No. 01-15-00492-CR, 2016 WL 5920768, at *8 (Tex. App.—Houston [1st

19

Dist.] Oct. 11, 2016, pet. ref'd) (mem. op., not designated for publication) ("Jury unanimity is required on the essential elements of the offense, but is generally not required on the alternate modes or means of commission."). We overrule Harris's third issue.

## Conclusion

We affirm the judgment of the trial court.


Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.

Do not publish. TEX. R. APP. P. 47.2(b).